## UNITED STATES v. WOOD et al.

(District Court. E. D. Pennsylvania. April 2, 1906.)

1. CARRIERS—FOREIGN SHIPMENTS—THROUGH RATES UNDER JOINT SCHEDULES.

   Through shipments of iron pipe were made from points in New Jersey and Pennsylvania to Winnipeg, Canada, part over the Baltimore & Ohio Railroad and part over the Philadelphia & Reading to the Great Lakes; thence by the Mutual Transit Company, a water carrier, to Duluth: and thence by the Great Northern Railway and its connections. There was no through joint rate filed or published, but there was a joint rate of 24½ cents per 100 pounds between the initial points and Duluth published and filed by participating carriers, and one of 25 cents per 100 between Duluth and Winnipeg filed by the Great Northern Railway Company. *Held,* that the lawful rate for the through carriage was the sum of such two rates, or 49½ cents per 100, and that under the interstate commerce law, as amended by Act March 2, 1889, c. 382, 25 Stat. 855 [U. S. Comp. St. 1901, p. 3156], neither line over which the shipments passed could lawfully charge a greater or less sum than was specified in the filed and published schedule of rates to which it was a party.

2. SAME—RECEIVING REBATE FROM JOINT RATE.

   The Elkins act of February 19, 1903 (chapter 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599]) makes it unlawful for a carrier to grant a rebate from a joint tariff rate which it has filed with the Interstate Commerce Commission or published, or in which it participates when filed or published by another carrier, but it does not make it a criminal offense to receive a rebate from a joint rate unless such rate has been both filed and published.

3. SAME—PARTIES TO THROUGH SHIPMENT.

   When a carrier unites with one or more others in making a rate for interstate or foreign shipments, and a through bill is issued therefor, it is subject to the interstate commerce act. An express agreement for the through rate is not required, but the successive receipt and forwarding in the ordinary course of business by two or more carriers under through bills, or any arrangement for a continuous carriage, constitutes assent to

such common arrangement, and makes the carrier a party to the contract, within the meaning of the act.

4. SAME—ACCEPTANCE OF REBATE—CRIMINAL LIABILITY.

The fact that a shipper who contracts for and receives a rebate in violation of the statute personally receives no benefit therefrom, but turns the same over without consideration to another, does not relieve him from criminal liability.

5. SAME—ACCEPTANCE OF REBATE BY CORPORATION—LIABILITY OF STOCK-HOLDER.

The fact alone that a defendant is a stockholder in a corporation which has accepted rebates in violation of law does not render him subject to the penalty imposed by the statute therefor.

Criminal Prosecution for Acceptance of Rebates in Violation of the Interstate Commerce Act.

J. Whitaker Thompson, U. S. Atty., and John C. Swartley, Asst. U. S. Atty.

William A. Glasgow, Jr., for defendants.

HOLLAND, District Judge   (charging jury).   The defendants Walter Wood and Stuart Wood, are charged in this indictment with having received a rebate and concession from a common carrier, engaged in interstate commerce, whereby 1,500 tons of iron pipe were transported from Florence and Camden, in the state of New Jersey, and from Emaus, in the state of Pennsylvania, to Winnipeg, in the province of Manitoba, Dominion of Canada, at a less rate than that named in the lawful tariffs published and filed by the common carriers over which the property was transported; that is to say, they are charged with having received a rebate or concession prohibited by the act entitled "An act to regulate commerce as amended by what is known as the Elkins Act," passed February 19, 1903 (chapter 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599]).

The charge in detail, as set forth in the indictment, is that Walter Wood and Stuart Wood, copartners, trading under the name of R. D. Wood & Co., at 400 Chestnut street, in the city of Philadelphia, sold to the city of Winnipeg, 1,500 tons of iron pipe, and entered into a contract on October 1, 1904, with C. E. Campbell, the Philadelphia general freight agent of the Great Northern Railway, a common carrier, subject to the provisions of the commerce act, to transport this pipe from Florence and Camden, in the state of New Jersey, and Emaus, in the state of Pennsylvania, to Winnipeg, part over the Baltimore & Ohio Railroad and part over the Philadelphia & Reading Railway to the Great Lakes, thence by the Mutual Transit Company to Duluth, in the state of Minnesota, and thence by the Great Northern to Winnipeg, for the price or sum of 49½ cents per 100 pounds, in accordance with the rates fixed by the joint tariffs published and filed by the Baltimore & Ohio Railroad Company and the Philadelphia & Reading Railway Company of 24½ cents per 100 pounds from the initial point of shipment to Duluth over their roads, and the Mutual Transit Company's line, and the joint tariff filed by the Great Northern Railway Company of 25 cents per 100 from Duluth to Winnipeg over its road and the Canadian Northern Railway. That the defendants, in accordance with their contract, paid these

common carriers 49½ cents per 100 for the transportation of this pipe, which was the sum of the two joint tariffs mentioned at that time in effect, and the only lawful rate for the transportation of this class of property, and that subsequently, on January 20, 1905, the defendants received from one of these common carriers mentioned in the joint tariffs a rebate or concession of $1,230.59 on the total shipment of 1,500 tons. This is the charge in the indictment, and it is made in accordance with the provisions of the commerce act and its amendments; a brief reference to the reasons for the enactment of which will aid us in understanding what a rebate or concession is, and the better enable us to determine whether or not the defendants violated the provisions of the act in this regard. The different views of the scope and meaning of the act as amended and as applicable to this case have been ably considered and presented by both sides, and both counsel for the government and the defense agree as to the evil which the law was intended to suppress.

Prior to February 4, 1887, the date of the enactment of the original act (chapter 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), a practice was indulged in by the managers of railroad traffic, and many favored shippers along their lines, which became so intolerable to a great number of other shippers not so favored that a demand for the enactment of a law to prohibit the continuance of this commercial offense was demanded. Prior to that time the railroad traffic in this country was regulated by the principles of the common law applicable to common carriers, which demanded little more than that they should carry for all persons who applied in the order in which the goods were delivered at the particular station, and that their charges for transportation should be reasonable. The evils which grew up under a policy of unrestricted competition took the shape of inequality in charges made or of facilities furnished, and were usually dictated by a desire to promote the interest of favored shippers along the lines of railways, to the great disadvantage of the competitors of those shippers who were not able to secure the same advantages as the shipper who received these concessions, and it frequently resulted that those who could get better rates for the transportation of their property than their competitors were able to drive their competitors out of business. These cases were so numerous that they became intolerable, and Congress enacted this interstate commerce act for the purpose of prohibiting these unjust discriminations by the railroads, to prevent undue and unreasonable preferences to certain favored persons, and for the general purpose of placing all shippers upon an equal footing, and to make it unlawful for a railroad, by any device, to give a less rate to one for similar services than to another. The devices by which these lower rates or advantages were given to the favored shippers were numerous and ingenious, and easily carried into effect, when the railroads were not required to keep a published tariff of rates open to the inspection of all, and prohibited by law from deviating therefrom. So Congress, in response to the popular demand, enacted the interstate commerce law. In the first section we find that the act shall apply to any common carrier or carriers engaged in transportation of passengers or property wholly by rail or partly

by rail and partly by water, when both are used under a common control, management, or arrangement, for a continuous carriage from one state or territory of the United States to any other state or territory of the United States, or from any place in the United States to an adjacent foreign country. It further requires that charges made for any services rendered in the transportation of property shall be reasonable and just, and every unreasonable and unjust charge for any such service is prohibited and declared to be unlawful. The act further provides that it shall be unlawful for any common carrier, subject to the provisions of this act, to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic in any respect whatsoever. It then provides that every common carrier, subject to the act, shall print and keep open to public inspection schedules showing the rates, fares, and charges for the transportation of passengers and property which it has established and which are in full force upon its route. And this printed schedule is required to plainly state the places upon its railroad to which property, etc., will be carried, and this public schedule shall contain the classification of freight. This schedule must be plainly printed, and copies posted in two conspicuous places in every depot, station, or office of such carrier where freight is received for transportation, in such form that they shall be accessible to the public, and can be conveniently inspected, and copies of the same must be filed with the Commission. This provision applies to single lines.

In addition to these schedules of rates, on a single line of a common carrier, subject to the act which they are required to file and publish, the act requires that in cases where freight passes over continuous lines or routes, operated by more than one common carrier, and the several common carriers operating such lines or routes establish joint tariffs of rates or charges for such continuous lines or routes, copies of such joint tariffs shall in like manner be filed with the Commission, and such joint rates and charges on such continuous lines so filed shall be made public by such common carrier when directed by said Commission in so far as may, in the judgment of the Commission, be deemed practicable. You will notice that the schedules of rates which a carrier subject to the act adopts for its own line must be posted in public and conspicuous places in the depot and other places, and a copy filed with the Commission; but the schedules of joint tariffs over continuous lines, operated by more than one common carrier, are required to be filed with the Commission, and such rates are only required to be made public by the common carrier in so far as the Commission, in its judgment, may deem practicable, and no advance shall be made in these joint rates so established, except upon 10 days' notice, and no reduction shall be made except after 3 days' notice to be given to the Commission, and the Commission may make public such proposed reduction in such manner as it may deem practicable, and it shall be unlawful for any common carrier, party to any joint tariff, to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of property, or for any services in connection therewith, between any points as to which a joint rate, freight, or charge is named thereon,

than is specified in the schedule filed with the Commission in force at the time. You will notice that a carrier cannot charge more or less compensation than that specified in the schedule filed with the Commission in force at the time.

Under the act, as amended March 2, 1889 (chapter 382, 25 Stat. 855 [U. S. Comp. St. 1901, p. 3156]), the carrier was required to charge the rate specified in the schedule of tariff passing over its line, and when it found that it was necessary to modify this rate to shippers shipping property beyond its line in a continuous route, in order that there might not be any discrimination, the act required that these carriers subject to the act, and joining to make up a continuous line, should file a joint tariff, specifying the charges for the transportation over the continuous line; and so long as such joint tariff was not filed by some one of the lines making up the continuous route, the different carriers were confined to the charges in their schedule covering their respective lines as to the classified property therein mentioned. And in a case like the one at bar, if a joint tariff had been established by arrangement and filed with the Commission, covering the lines of the Baltimore & Ohio and the Mutual Transit Company to Duluth, neither the Baltimore & Ohio nor the Mutual Transit Company can deviate from that joint tariff, except upon the usual notice to be filed with the Commission; and where, as in this case, there was no joint tariff filed from Philadelphia to Winnipeg, neither company over which this shipment of iron pipe passed could lawfully charge or demand or collect a greater or less compensation for the transportation of property than was specified in its schedule of its joint rates filed with the Commission. In other words, if these carriers desired to form a continuous line from Philadelphia to Winnipeg, and to make a lower rate for the transportation of property than they were collecting on the two joint tariffs then in force covering the same route, then they should have given notice, according to the act, and filed their schedule with the Commission; and so long as they did not do this, they could not lawfully deviate from the rate established, which is the sum of the two joint rates mentioned.

Under the original act, as amended in 1889, as to the carrier, any deviation from the joint rates specified in the schedule filed was unlawful, and the Elkins act so amended this as to the carrier that any departure from a joint tariff filed by it, or any departure from a joint tariff published by it, or any departure from a joint tariff filed or published in which it participated in the rates so filed or published, was made unlawful. That part of the Elkins act which makes it unlawful for the carrier to offer, grant, or give any rebate, concession, or discrimination in respect to the transportation of property, whereby any such property shall by any device whatever be transported at a less rate than that named in the tariff published and filed, may be extended by the subsequent clause as to the carrier so as to make it unlawful to offer, grant, or give a rebate on joint tariffs in which such carrier participated, but as to the shipper or a person receiving a rebate the tariff must be filed and published. In other words, it may be unlawful for a carrier to give a rebate, concession, or discrimination on a joint tariff filed by it, or on a joint tariff published by it, or on a joint tariff

in which it participated when filed by another, or on a joint tariff in which it participated when published by another, but it is only unlawful for a shipper to receive a rebate on a joint tariff which is both filed and published. The act, so construed, works no injustice to either the carrier or the shipper. The carrier knows whether it has either filed or published a joint rate, or whether it has participated in a joint rate filed or published by another, and if it departs therefrom it does so willfully and with knowledge; and if a shipper receives a rebate on a joint tariff which has been both filed and published, he does so with notice of the lawful rate, and as to him, when the rate is filed and published, he is bound to take notice, and the law will not excuse him if he fails to inform himself when the opportunity is afforded, which the law provides by requiring the filing and the publishing of the rates for his information. And as to the question of actual notice to the shipper in this case, you will say from the evidence of Mr. Morton, who was the representative of the defendants in carying out the transaction, together with the other evidence, whether or not the defendants knew of their own knowledge, or through their agent, what the joint rates were as filed and published at the time the contract was made. You will recall what knowledge Mr. Morton showed with regard to rates—not only those involved in this controversy, but the rates, both local and through, on property transported across the entire continent from Philadelphia to California. But aside from the question of the defendants' actual knowledge, they are bound to take notice of joint tariffs filed and published, and if they receive a rebate, concession, or discrimination, either themselves or by their traffic manager, they are responsible.

It is contended on the part of the defendants that the Mutual Transit Company is an independent water line, and that a contract with it was entered into by the defendants separate and apart and entirely independent from any connection whatever with the railroads which took part in the transportation of this property, and that in consequence of this separate and distinct agreement they are not subject to the interstate commerce act, or its amendments, and could do as it saw fit with regard to a return of its charge for the transportation. The government contends that this is not so, but, on the other hand, that the Mutual Transit Company, while it is a corporation engaged in water transportation, yet it was engaged in such transportation involved in the case at bar under a common control, management, or arrangement for a continuous carriage or shipment, within the meaning of the language as used in the act to regulate commerce, making its provisions apply to carriers engaged in transportation of property partly by rail and partly by water when both are used, the Mutual Transit Company being the part by water used in this case. You will recall what the facts are as testified to on this point. Mr. Morton testified that he was the traffic manager of the defendants, and contracted with Mr. Campbell, the general freight agent of the Great Northern in this city, for the transportation of this freight from the point of shipment to Winnipeg, agreeing with Mr. Campbell at the time upon the initial roads which were to carry it to be delivered to the Mutual Transit Company, thence to the Great Northern on to Winnipeg; that he arranged for the prepayment of

the freight, and approved the bills for the freight at 49½ cents per 100 pounds, the amount, as you will recall, of the sum of the joint tariffs filed by the initial roads and by the Great Northern, which were put in evidence here. He says the freight was to be carried for 45 cents, and that he agreed with Campbell that the difference between 45 cents and 49½ cents should be refunded, and that he knew that there was to be an overcharge, which was to be refunded, which was to be 4½ cents per 100, and the arrangement with Campbell, he says, was that this refund should be made by the Mutual Transit Company, which arrangement was made before the contract was secured, and that this refund was paid, in accordance with Campbell's arrangement, by the Mutual Transit Company. He also said, in direct examination, that he did not recall having any conversation with Mr. Lake in regard to the refund of the 4½ cents per 100. He further states, on cross-examination, that before Campbell made the arrangement with him, that he (Campbell) telephoned Mr. Noble, who represents the Mutual Transit Company, and after this telephone communication Campbell reported to the witness (Mr. Morton) that the Mutual Transit Company would make them a rate of 45 cents, and at the same time Campbell told Morton to pay the bills when rendered at 49½ cents, and that the Mutual Transit Company would pay back the overcharge.

This is the evidence as to the contract, together with whatever evidence you may remember was introduced into the case. You will say whether there is any other evidence at all as to a separate and independent contract with the Mutual Transit Company, and it is for you to say whether or not this transaction, as a whole, tends to show an independent contract with the Transit Company, or a contract for transportation under a common control, management, or arrangement for a continuous carriage or shipment; and further, on this question of independent contract, whether they were transported by an arrangement for a continuous carriage or shipment, you will take into consideration the contract as testified to by Morton; the fact that the Transit Company entered into the carriage of this interstate traffic by agreeing to receive the goods by virtue of a through shipment, and having participated in the joint rates charged according to the published tariff, although it refunded part afterwards, whether or not it did become part of this transportation line by arrangement for the continuous carriage or shipment of the property from the initial point to Winnipeg. The test of subjection to the act is through routing in interstate commerce. When a carrier unites with one or others in making a rate for interstate traffic, and a through bill is issued therefor, it is subject to the act. An express agreement for a through rate is not required, but the successive receipt and forwarding in the ordinary course of business by two or more carriers in interstate traffic, under through bills, or any arrangement for a continuous carriage over their lines, constitutes assent to such common arrangement for the carriage within the meaning of the act. If you find there was no independent contract with the Mutual Transit Company, but that the contract was to pay the lawful joint tariff rates of 49½ cents per 100, and that the arrangement was accepted by the Transit Company and the other carriers named for that rate on a through

shipment, with agreement on the part of the Transit Company to refund, and the Mutual Transit Company and the others participated in this through rate and charge, then all of them become a part of the continuous line by arrangement for the continuous carriage or shipment from one place in the United States to an adjacent foreign country and all subject to the provisions of the commerce act and its supplements.

In this case, if you believe the uncontradicted evidence of the government, the lawful rate from the initial point to Duluth is 24½ cents a 100, and from Duluth to Winnipeg 25 cents per 100, and from the initial point to Winnipeg the sum of the two, or 49½ cents per 100. They were published and filed, and both the carriers and the shippers were bound by the commerce act to observe them. The carriers were in duty bound to the shippers generally to charge these rates, and the shipper was required to pay these rates; they were open to all shippers alike, and upon them, as a basis, all dealers in iron pipe could fairly compete. If the shippers and transportation companies had concluded it was necessary, in order to compete with any other country or parts of this country, to have a lower rate, the act points out a lawful way by which it can be secured—that is, by giving three days notice of any reduction in joint rates—and this reduction would be given such publicity as the Commission directed, and all dealers in articles of commerce, such as these in question, would then have fair treatment, and no special favor to any one. The necessities of the particular case cannot excuse a failure to observe the provisions of this act. If the joint rates for classified property scheduled and filed and made public, as required by law, to different points, is too high to enable a business man to compete in the market, the act points out the remedy, and it must be followed; and if it is not followed, and the shipper receives a rebate, concession, or discrimination, he has offended against the act as amended by the Elkins act of 1903, which prohibits any person, persons, or corporations from soliciting, accepting, or receiving a rebate, concession, or discrimination in respect to the transportation of any property whereby any such property shall by any device whatever be transported at less rate than that named in the tariffs published and filed.

If you find that this property was transported partly by rail and partly by water by common management, and that a rebate was paid, contrary to law, by the Mutual Transit Company, the next question is whether or not the defendants received such rebate. The defendants say they did not make this contract, they did not know of its terms, nor that a refund had been agreed upon or made, until their attention was called to it, long after the transaction, by the Interstate Commerce Commission. They say they permitted the Florence Iron Company and the Camden Iron Works, two corporations, to use the name of R. D. Wood & Co., because it was well known, for the purpose of obtaining business, and R. D. Wood & Co. acted as selling agent for both corporations. The defendants' evidence further shows that the office of R. D. Wood & Co. is the office of both corporations, and the employés in R. D. Wood & Co.'s office are also the employés of both the Camden Iron Works and the Florence Iron Company, and paid by them. R. D. Wood & Co. are the sole agents of these corporations, and the employés in their

office are authorized to sign the name of the corporations to contracts such as the one in question, and that of the Camden Iron Works was signed to the contract made by the employés in R. D. Wood & Co.'s office; that the freight was paid by the Florence Iron Works and Camden Iron Works on the contract made by Morton, and that Morton was the traffic manager for the defendants and both of these corporations; that Walter Wood only, prior to the making of the contract, knew that Morton was going to undertake to get a through rate of freight from the foundries to Winnipeg, and that he was successful in securing one, but that he (Walter Wood) did not know the price at that time, and that he (Walter Wood) did not hear of the overcharge coming in until between October, 1904, and January, 1905, probably before the contract had been awarded. The defendants were not consulted when the overdraft came in, as the men in their office he claims knew where it was to go, and as the bookkeeper of the two corporations is the bookkeeper of R. D. Wood & Co., and there is only one set of books kept for both, the overcharge was turned over to the Camden Iron Works, and that the defendants do not receive any commissions on these sales; that the amount received belonged to the Camden Iron Works, was turned over to them and received by them, and was never received by the defendants.

You will recall that no act done by any of the representatives of R. D. Wood & Co. and the iron companies testified to here is repudiated by R. D. Wood & Co. The facts are submitted as they really are, with no disposition on the part of the defendants to qualify them. They contend that the facts stated make it appear that they did not receive the rebate, but that the iron company received it. It was no device or scheme on their part to so arrange their business for the purpose of evading this act; it was their method of arranging their business as the most profitable and convenient scheme to conduct it, and this transaction, like all others, was conducted in accordance with their joint plan of management.

On the other hand, the government contends that this contract was made by the defendants, and the rebate received by them. There is no dispute about the fact that Morton made the contract he says for R. D. Wood & Co.; that the draft was sent to R. D. Wood & Co.'s representative; that the check for the amount was drawn to the order of R. D. Wood & Co., the defendants, and through their employés indorsed over to the Camden Iron Works, deposited by it, and by it the amount was collected; and the government further says that the voucher accompanying it was also sent to R. D. Wood & Co., and turned over in the same way. This, together with all the other facts and circumstances, the government says establishes the fact that the rebate was received by the defendants. It is for you to say whether or not under the arrangement and the facts of this case they received this rebate or the iron company received it. If they contracted for it and received it, and saw fit to turn it over to the iron company without any consideration whatever, or if in this transaction the defendants contracted for a rebate, received it, and turned it over in settlement of that transaction with the iron company, they would not be excused; but if the defendants had

nothing to do with the contract made by Morton—no interest in it whatever—and if the rebate was to be paid to the Camden Iron Works, and it was paid to the Camden Iron Works, then the defendants should be acquitted. I may say that, under the peculiar facts and circumstances of this case, if Morton made this contract representing R. D. Wood & Co., with what knowledge Mr. Walter Wood had of the transaction, as testified to by him, and the rebate was accepted by the defendant company—that is, R. D. Wood & Co.—and turned over to this iron company without any consideration, or for nothing, and the fact that R. D. Wood & Co. received no benefit directly as a firm, and turned it over for nothing, Mr. Stuart Wood, while he is a partner, but takes no part in the management of the business, and knows absolutely nothing about it, and having received absolutely no interest from it directly as a member of the firm—if you find these to be the facts—then, under the peculiar circumstances of this case, he should not be found guilty; but it is for you to say whether or not you will find these to be the facts as to him in this case. The fact that they own the controlling stock in one corporation, and probably in the other, has nothing to do with the case. There are more than 80 stockholders in these corporations, and if you could hold one owner of stock in these corporations you could hold every other owner of stock in them. You will see at once to what an absurd and unjust conclusion you would come if the owner of stock in a corporation could be prosecuted because the corporation accepted a rebate. I therefore charge you that, if you find that the defendants did not receive this rebate, and that the Camden Iron Works did receive it, they are entitled to be acquitted, and the fact that they are stockholders does not bring them within the provisions of this act, and the verdict should be in their favor; but you will take into consideration the intimate business relations and all the other facts and circumstances shown here in connection with the refund and say whether the Camden Iron Works or the defendants received the amount, and if they received it you should return a verdict in manner and form as they stand indicted.

The defendants are entitled to the benefit of any reasonable doubt. If, upon examining any of the questions that have been submitted to you, you find that you have a reasonable doubt as to the guilt of either or both of the defendants, it would be your duty to render a verdict of acquittal. If, however, from the evidence as a whole, you are convinced beyond a reasonable doubt that the defendants are guilty as charged in the indictment, then you should find a verdict in manner and form as they stand indicted. And in the examination of the questions submitted you should not be influenced by any considerations of whether or not this is a good law or bad law, whether or not the government has prosecuted others who may have taken part in its violation, nor should you take into consideration who the defendants are. If we are to be a law-abiding people, it is our duty to enforce the laws as they have been written upon the statute books, regardless of any outside considerations, and be controlled, and controlled only, by the law and the evidence in each particular case.