## MUTUAL TRANSIT CO. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. April 4, 1910.)

### No. 34.

1. Carriers (§ 24*)—Interstate Commerce Act—Carriers by Water.

Broadly speaking, Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847 (U. S. Comp. St. Supp. 1909, p. 1138), is not applicable to carriers by water, and such a carrier does not become subject to the act in respect to an interstate shipment in part over its line and in part over connecting railroad lines, unless, as provided in section 1 thereof, it was "under a common control, management or arrangement" with the railroad carriers for the continuous carriage of such shipment.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 60, 61; Dec. Dig. § 24.*]

2. Carriers (§ 24*)—Interstate Commerce Act—Giving Rebate—Carriers Subject to Act—"Common Arrangement"—"Giving of Rebate."

A carrier by water which has not joined in a tariff and division sheet filed and published by connecting railroad carriers for the through carriage of interstate shipments between two points does not become a party to a "common arrangement" for the carriage of such a shipment within the meaning of Elkins Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 (U. S. Comp. St. Supp. 1909, p. 1138), by accepting and carrying the same under a through bill of lading issued by the initial railroad carrier stating the published tariff rate and the division of the charges in accordance therewith, nor by receiving its divisional part of such rate, where it had previously privately contracted with the shipper to "protect" a lower through rate, pursuant to which contract the shipment was made, and its return to the shipper of a part of its divisional share of the freight paid, in fulfillment of the contract, was not the "giving of a rebate" in violation of the act.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 60, 61; Dec. Dig. § 24.*

For other definitions, see Words and Phrases, vol. 1, p. 500.]

3. Carriers (§ 24*)—"Conventional Division of Charges."

Where goods are received in transit under a "conventional division of the charges," there is an apportionment of the charges by agreement of the participating carriers.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 24.*]

In Error to the District Court of the United States for the Western District of New York.

Action by the United States against the Mutual Transit Company. Judgment for plaintiff, and defendant brings error. Reversed.

A judgment was rendered against the plaintiff in error, the defendant below, upon an information charging such defendant with the offense of unlawfully and willfully offering, giving, and granting a rebate or concession, in violation of the act to further regulate commerce of February 19, 1903. In

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the statement and opinion following the parties are designated as in the District Court.

The defendant, the Mutual Transit Company, is a New York corporation engaged in business as a carrier by water only and operating a line of steamships on the Great Lakes from Buffalo, N. Y., to West Superior, Wis. In October, 1904, the Camden Iron Works, a manufacturing corporation of New Jersey doing business at Camden and Florence, in that state, entered into a contract through its selling agents to supply a large quantity of iron water pipe to the city of Winnipeg, Manitoba. These selling agents desired to obtain a joint through rate from carriers for the transportation of said iron pipe, and, after inquiring of other lines, obtained an agreement from the defendant to "protect" a rate of 45 cents per hundred pounds on said iron pipe from the New Jersey points through to Winnipeg, provided the defendant could control the routing. Subsequently the Camden Iron Works obtained additional iron pipe necessary to fulfill its contract from a manufacturing concern at Emaus, Pa., and the defendant agreed that the same through rate of 45 cents should apply to these shipments from Emaus. The alleged rebate in question here is in connection with the latter shipments only. The iron pipe was billed and shipped from Emaus by the Philadelphia & Reading Railroad and Lehigh Valley Railroad to Buffalo, thence by the defendant's steamship line to West Superior, and thence by the Great Northern Railway and Canadian Northern Railway to Winnipeg.

At the time of this arrangement and these shipments, there was on file with the Interstate Commerce Commission a through tariff filed by the Philadelphia and Reading Railroad Company establishing a joint through rate on iron pipe from Emaus to West Superior of 24½ cents per hundred pounds. The defendant was designated in this tariff as a connecting and participating carrier, but there was no proof, and it was not claimed, that it had ever filed any written concurrence therein. This tariff had been originally filed by the Philadelphia & Reading Railroad Company in April, 1903, and the defendant had then filed its concurrence. It was, however, subsequently canceled by the railroad company, and, although later restored by it, the defendant had never filed any written concurrence in such restored tariff.

At this time there was also on file with the Interstate Commerce Commission a tariff filed by the Great Northern and Northern Pacific Railways naming the Canadian Northern Railway as their connecting carrier to Winnipeg and establishing a rate on iron pipe from West Superior to Winnipeg at 25 cents per hundred pounds. It was not claimed that the defendant was named in or had ever filed any concurrence in this tariff. It did not appear that any joint through rate from Emaus points to Winnipeg had ever been filed with the commission by any carrier.

The Philadelphia & Reading Railroad Company and other participating carriers were not informed of the understanding of the defendant with the shipper for a 45-cent through rate and the bills of lading, shipping receipts and other documents relating to these shipments called for a rate of 49½ cents, being the sum of the two rates of 24½ cents and 25 cents already mentioned. They also stated a division of the 24½-cent part of the 49½-cent rate among the participating carriers, in accordance with division sheets referred to in the first tariff aforesaid. The Philadelphia & Reading Railroad Company, the initial carrier, presented bills to the Camden Iron Works, the shipper, at said 49½-cent rate. When this was communicated to the defendant, its representative told the shipper to pay the rate charged, and to look to it for the return of the excess above the agreed rate. Accordingly, the shipper paid the charge, and then claimed and received from the defendant the amount of said excess—$267.33—and it was this amount which the government contended constituted the rebate or concession charged. The adjustments between the participating carriers were so made that all the railroads received their stated proportions of the 49½-cent rate. The defendant also received its stated proportion, but returned the aforesaid amount to the shipper in order to comply with its agreement.

The defendant was found guilty of the offense charged in the information, and from the judgment entered upon the verdict has brought this writ of error.

Moot, Sprague, Brownell & Marcy (Adelbert Moot, of counsel), for plaintiff in error.

John L. O'Brian, for defendant in error.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above). The act to further regulate commerce, known as the "Elkins Act" (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1909, p. 1138]), as it existed at the time of the aforesaid transactions, made it a midemeanor for any person or corporation—

"to offer, grant or give or to solicit, accept or receive any rebate, concession, or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to the said act to regulate the commerce and the acts amendatory thereof, whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carriers, as is required by said act to regulate commerce and the acts amendatory thereof, whereby any other advantage is given or discrimination is practiced."

Whether, then, the defendant offered a rebate or concession in violation of this statute depends upon whether it was a carrier subject to the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]). If it were not required to file its rates and were not bound by rates filed by other carriers, it had full right to carry at lower rates.

The interstate commerce act, broadly speaking, applies to railroad companies. All railroads engaged in interstate transportation come within its provisions. On the other hand, broadly speaking, the act does not apply to carriers by water. As a general rule, such carriers are not required to file or publish their rates, and are under no statutory restrictions with respect to rebates or other discriminations. The fact even that an independant water line is part of a through interstate route does not in and of itself bring it within the act. But certain water carriers are subject to the act and that which is necessary to bring such a carrier within its provisions is stated by the act itself. Section 1, as it existed at the time of the transactions in question, provided:

" * * * That the provisions of this act shall apply to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used, under a common control, management or arrangement for a continuous carriage or shipment, from one state or territory * * * to any other state or territory. * * * "

The defendant, then, was subject to the act only in case it is established that it was "under a common control, management or arrangement" with the railroad carriers. And as no arrangement with respect to the carriage of other freight for other shippers is shown, and as it is not contended that the defendant and any of the railroad carriers were under a "common control" or "management," the inquiry may be reduced to the question whether it is shown that there was a "common arrangement" for the continuous carriage of this iron pipe for the Camden Iron Works from Emaus to Winnipeg. The phrase "common arrangement," in view of its context, evidently means

an agreement or understanding between connecting carriers with respect to the transportation of merchandise and the charges and division of the charges to be made therefor. A mere agreement by an independent water carrier to accept freight from a connecting railroad, and to transport it for its own particular rate, might be an "arrangement" for continuous carriage, but would not be a "common arrangement."

It is not necessary that a "common arrangement" should be established by proof of formal concurrences in tariffs and division sheets. In the absence of a prior special agreement, we think that a "common arrangement" might be established by receiving and carrying freight under a through bill of lading stating a division of the charges. In the present case, although the defendant had not concurred in the tariff filed by the Philadelphia & Reading Railroad Company, it might, by receiving and transporting the iron pipe under the bill of lading and other documents showing the 49½-cent rate and the apportionment thereof, have made itself a party to the rate, and have carried under a "common arrangement," had it not been for its special contract with the shipper.

The real arrangement under which this freight moved was made between the defendant and the shipper. The defendant entered into no agreement with the other carriers. They were not parties to its agreement with the shipper. The defendant agreed with the shipper to "protect"—i. e., guarantee—a through rate of 45 cents from port of origin to destination. This amounted to an agreement upon its part to see that the other carriers were paid their legal charges and to accept what was left for the water transportation. The defendant did not agree that the other carriers should reduce their charges, nor did it seek to have them do so. The mere fact that the initial carrier made out the bill of lading according to its published rates and division sheets, and that the defendant permitted the carriage to go on under such documents, did not, in our opinion, make it a party to a "common arrangement" for a rate in excess of that stipulated in the real contract under which the freight was offered for transportation.

If the defendant, after making its contract with the shipper, had notified all the railroad carriers that it had guaranteed a through rate of 45 cents, and would pay them their full published rates and accept what was left for its own services, it could hardly be claimed that the defendant entered into a "common arrangement" for a 49½-cent through rate merely because the initial carrier made out the documents to accompany the shipment upon that basis. And, if the defendant did not notify the other carriers, we think the principle not essentially different. An intermediate water carrier which is a party to a special agreement with a shipper covering a shipment cannot properly be said to be a party to a "common arrangement" wholly inconsistent therewith merely because of recitals by the initial carrier in the bill of lading. Especially should this be true where the water carrier has refrained from concurring in the tariff under which the recitals are made.

But it is contended by the government that the Supreme Court determined what is a "common arrangement" in the "Social Circle" Case (Cincinnati, etc., R. Co. v. Int. Com. Com., 162 U. S. 184, 16 Sup.

Ct. 700, 40 L. Ed. 935), and that the present case is governed by that decision. While in view of the decisions upon the act as unamended the distinction is perhaps not of importance, it will be noticed that the court was construing the phrase as applying to land transportation only, and not to carriage by water. The question was whether a railroad company whose road was within the limits of a state had so engaged in transportation with foreign companies as to become a part of a continuous line and subject to the interstate commerce act, and the Supreme Court held that such a company which entered into the carriage of foreign freight by agreeing to receive goods upon foreign through bills of lading and to participate in through rates and charges did by such arrangement become subject to the act.

Mr. Justice Shiras said (Page 193 of 162 U. S., page 704 of 16 Sup. Ct. [40 L. Ed. 935]):

"All we wish to be understood to hold is that when goods shipped under a through bill of lading from a point in one state to a point in another are received in transit by a state common carrier, under a conventional division of the charges, such carrier must be deemed to have subjected its road to an arrangement for a continuous carriage or shipment within the meaning of the act to regulate commerce."

A "conventional division of the charges" obviously means an apportionment of the charges by agreement of the participating carriers. No agreement of this character is shown in the present case. The necessary payments to the railroads of their legal rates did not amount to such an agreement. The mere recital by the initial carrier of a division in the bill of lading would be insufficient to show that the defendant agreed to it in the face of its special arrangement with the shipper to the contrary. Here there was no agreement, express or implied, to participate in the 49½-cent rate. On the contrary, there was a special agreement made in advance for the 45-cent rate which necessarily involved a materially different division. In our opinion the decision in the "Social Circle" Case is inapplicable to the facts in this case, and we agree with Judge Dallas of the Circuit Court of Appeals for the Third District in the case appealed by the Camden Iron Works to that court from a judgment convicting it of receiving the rebate which the defendant is here charged with giving. Camden Iron Works v. United States, 158 Fed. 561, 564, 85 C. C. A. 585, 588. Judge Dallas, in comparing the "Social Circle" Case with the one before him said:

"But the nature of the case with which that tribunal was dealing, when it made the deliverance that has been referred to, was so essentially different from the case now under consideration as to render the decision in the former wholly inapplicable to the latter. The sort of 'arrangement' to which the attention of the Supreme Court was directed was one between the carriers themselves, and all that was actually adjudged is that a state common carrier by railroad, who receives in transit goods shipped under a through bill of lading from a point in one state to a point in another, and 'under a conventional division of the charges,' subjects its road to an arrangement within the meaning of the act. Thus understood, there is nothing in that case with which our view of the present one conflicts. In this instance the contract for continuous carriage or shipment was between the shipper itself and a single carrier by water. * * * But, as to the transit company itself, the proofs show that an element which materially influenced the result in the case of

the Cin., N. O. & Tex. Pac. Railway Company is wholly lacking from this case, unless, indeed, the transit company's necessary concessions to the carriers by railroad of their own lawful rates constituted 'a conventional division of the charges,' and to us it seems clear that it did not."

But, even if the defendant was a party to a "common arrangement" for the continuous carriage of the iron pipe and subject to the interstate commerce and Elkins acts, it is still necessary to show that it violated the provisions of the latter. That a carrier is subject to a statute does not tend to show that it has offended against it.

It must be shown, in the first place, that the defendant was bound by the rate which it is charged with offering a rebate or concession from. Otherwise there would be no offense. Carriers, as a general rule, become bound by through rates by formally agreeing thereto or concurring therein. Section 6 of the interstate commerce act as it existed at the time of these transactions provided, among other things:

"Every common carrier subject to the provisions of this act shall file with the commission hereinafter provided for copies of its schedules of rates, fares, and charges which have been established and published in compliance with the requirements of this section, and shall promptly notify said commission of all changes made in the same. Every such common carrier shall also file with said commission copies of all contracts, agreements, or arrangements with other common carriers in relation to any traffic affected by the provisions of this act to which it may be a party.

"And in cases where passengers and freight pass over continuous lines or routes operated by more than one common carrier, and the several common carriers operating such lines or routes establish joint tariffs or rates or fares or charges for such continuous lines or routes, copies of such joint tariffs shall also, in like manner, be filed with said commission."

Concededly the defendant at the time of the shipments in question was not a formal party to any contract in relation to through traffic nor to any joint tariffs on file with the Interstate Commerce Commission. Its previous concurrence had been canceled before these transactions took place, and, so far as formal action is concerned, it stood at such times as a wholly independent carrier by water. But, under certain conditions, a carrier may become bound by a rate published and filed by another carrier without formal concurrence therein. The concluding paragraph of the Elkins act, in the form in force in 1904, provided:

"Whenever any carrier files with the Interstate Commerce Commission or publishes a particular rate under the provisions of the act to regulate commerce or acts amendatory thereto, or participates in any rates so filed or published, that rate as against such carrier, its officers or agents, in any prosecution begun under this act shall be conclusively deemed to be the legal rate, and any departure from such rate, or any offer to depart therefrom, shall be deemed to be an offense under this section of this act."

And in United States v. New York Central R. R. Co., 212 U. S. 509, 515, 29 Sup. Ct. 313, 314, 53 L. Ed. 629, Mr. Justice Day said of this provision:

"We think it entirely clear that the concluding part of section 1 of the Elkins act which we have above quoted brings all of the carriers who have participated in any rate filed or published within the terms of the act, as much so as if the tariff had been actually published and filed by such participating carrier."

Consequently, although the defendant did not file a concurrence in the 24½-cent rate from Emaus to West Superior published and filed by the Philadelphia & Reading Railroad Company, such rate, in case the defendant participated in it, would as against the defendant—assuming the application of the statute—be conclusively deemed to be the legal rate.

Now, the only evidence tending to show that the defendant participated in the published rate was that which we have already considered as tending to show the "common arrangement"—the through bill of lading, shipping receipts, and other documents. In other words, the evidence which it is contended makes the defendant subject to the statute must also serve to establish an essential element of the offense of violating it.

We think it very doubtful whether the defendant upon the evidence presented can be said to have participated in the 24½-cent rate, the 25-cent rate, or the total of the two, the 49½-cent rate. To participate in a rate is to share in a rate, and the defendant under its express antecedent contract with the shipper which established the real rate could hardly share in any excess over it. If as a matter of convenience in bookkeeping the defendant received more than it was really entitled to and returned the balance, it is by no means clear that it participated in the advanced rate, within the meaning of the statute. And if the defendant did not participate in, and thus become bound by, the published rate, it was not guilty of offering rebates or concessions from it.

We prefer, however, to place our decision upon the ground that the defendant was not subject to the statute which it is charged with violating, rather than upon the ground that, being subject to the statute, it did not contravene its provisions.

The judgment of the District Court is reversed.