## AMERICAN PEANUT CORPORATION v. ST. LOUIS AND TENNESSEE RIVER PACKET COMPANY.

Middle Section. May 21, 1926.

Certiorari denied by Supreme Court, December 11, 1926.

1. **Carriers.** Under American common law the liability of a carrier is limited to its own line.

   Under the American common law the normal liability of a connecting carrier is limited to his own line and the mere acceptance of goods consigned to points beyond the line of the carrier does not operate to extend this line.

2. **Commerce.** The Interstate Commerce Act does not apply to carriers who operate wholly by water.

   The purpose of congress in the passage of the Interstate Commerce Act was not to regulate water carriers and hence the act was not made applicable to carriers who operate wholly by water.

3. **Carriers.** Interstate Commerce Act does not apply to a water carrier whose line connects with a railway carrier unless they are under a common control.

   The fact that the lines of a railway carrier and a water carrier connect and thus form a continuous line of transportation over which traffic moves between two or more states does not bring the water carrier within the con-

trol of the Federal Act, unless such carriers are under a "common control" or "common management" or there is between them a common agreement for a continuous carriage or shipment.

4. **Carriers. Evidence. Evidence held to show water carrier not subject to Interstate Commerce Act.**

In an action instituted against an initial carrier to recover for the loss of peanuts where the evidence showed that the initial carrier was a water carrier and did not act in connection with or was under the control of the connecting railway carrier, held that the water carrier was not subject to the Interstate Commerce Act and was not liable for damages accruing on a connecting carrier.

Appeal from Chancery Court, of Humphreys County; Hon. J. W. Stout, Chancellor.

Affirmed.

Shannon & Tubb, of Waverly, for appellant.

Fuqua & Carter, of Waverly, and Wheeler & Hughes, of Paducah, Ky., for appellee.

FAW, P. J. This suit was brought in the chancery court of Humphreys county, on March 5, 1920, by American Peanut Corporation against St. Louis & Tennessee River Packet Company. By final decree entered on March 16, 1925, the complainant's bill was dismissed and the costs of the cause were adjudged against the complainant and the surety on its prosecution bond, for which execution was awarded. The complainant obtained and perfected an appeal to this court and has assigned errors here.

In March, 1918, defendant Packet Company, as a common carrier, was operating a line of steamboats on the Tennessee River. On March 9, 1918, the complainant Peanut Company, through its agent W. H. Walker, delivered to the defendant, at Cuba Landing, Tennessee, 932 bags of peanuts, and on March 31, 1918, complainant, through its agent W. M. Conder, delivered to defendant, at Mousetail Landing, Tennessee, 69 bags of peanuts. Both of said consignments of peanuts, amounting in the aggregate to 1001 bags, were transported by defendant, on its steamer Kentucky, from the landing above mentioned, to Johnsonville, Tennessee, where they were unloaded from defendant's boat and delivered to the Nashville, Chattanooga & St. Louis Railway (usually described in the record as "N. C. & St. L. Ry." or "N. C. & St. L. R. R."), and were by said N. C. & St. L. Railway and connecting carriers transported to Norfolk, Virginia, and there delivered to the complainant by the Sea-board Air Line Railway Company. However, when delivered, there was a shortage in the shipments of three bags, and a shortage of several thousand pounds in weight.

The purpose of the bill in this case was to recover the value of the aforesaid "shortage" in the peanuts and to recover an alleged

overcharge in freight collected from the complainant on account of said peanuts. As a matter of convenience, the two consignments of peanuts above mentioned may be treated as one shipment. Complainant alleges in its bill that the defendant issued bills of lading for the peanuts, agreeing to transport them to the complainant's place of business at Norfolk, Virginia, in a reasonable time and in good condition; that this was an interstate shipment and was so known and accepted by the defendant; that said bills of lading were duly delivered to the complainant and it is the owner and holder of same; that defendant is and was the initial carrier of said lot of peanuts, and defendant proposed to and did deliver them from its said boat to connecting carriers—railroads—and in that way said peanuts, or a portion thereof, were finally delivered to complainant at its place of business in Norfolk, after much delay and waste of said peanuts; that complainant delivered 1001 bags of peanuts to defendant to be safely transported as aforesaid, which 1001 bags, when delivered; to defendant and loaded on its boat, weighed 94,958 pounds, but that only 998 bags of said peanuts were delivered to complainant, which 998 bags weighed 82,007 pounds, making a loss in transit of 12,951 pounds of peanuts which were worth and could have been sold for the sum of eight cents per pound at that time.

Complainant further alleges in its bill that it paid the sum of $615.50 freight bill, and $16.83 war tax, on said shipment, whereas, it should have paid only twenty cents per bag and thirty-eight cents per one-hundred weight, and that there was therefore an overcharge for freight paid by complainant that should be refunded by defendant.

Complainant also alleges that the loss and damage to the peanuts was occasioned either by the negligent and careless way in which the defendant handled said shipment of peanuts or by the negligence and carelessness of the transportation company to which defendant delivered same for shipment to complainant after it was taken off the boat of the defendant, and the complainant alleges that "notice of the foregoing losses was properly and duly given."

It is further alleged in the bill that "this suit is brought against the defendant under a statute of the United States as amended by an amendment known as the Carmack Amendment," and the text of the Carmack Amendment to the Interstate Commerce Law is copied into the bill.

Complainant prayed for a decree in its favor against the defendant for the loss sustained on said shipment of peanuts and for the overcharge in amount of freight paid by complainant.

In its answer, filed May 18, 1920, defendant Packet Company admits that it received the two consignments of peanuts, aggregating 1001 bags, as alleged, but denies that same were taken for shipment to the complainant's place of business at Norfolk, Virginia. De-

fendant denies that said peanuts constituted an interstate shipment, and alleges that "it expressly received them for the sole purpose of shipping them to Johnsonville at the intersection of the Nashville, Chattanooga & St. Louis Railway and the river."

Defendant avers in its answer that it accepted said peanuts for shipment to Johnsonville at the rate of twenty cents per bag; that it did not undertake to route them from there on and did not quote any rate for through shipment; that it merely undertook to ship said peanuts from the aforesaid landing to their destination at Johnsonville, all three points (Cuba Landing, Mousetail Landing and Johnsonville) being within the State of Tennessee, and the shipment therefore being an intrastate shipment.

Defendant further avers in its answer that said peanuts were delivered at Johnsonville and the Packet Company was discharged by agents of said N. C. St. L. Railway Company and the freight for the transportation of the peanuts to that point was paid to the defendant; that said peanuts were reshipped (from Johnsonville) and that the N. C. & St. L. Railway became the initial carrier in the interstate shipment from Johnsonville to Norfolk, Virginia.

Defendant denied that there was any such loss of part of peanuts as alleged in the bill, and particularly denied that there was any loss, damage or injury to the peanuts while they were in the possession of defendant or as a result of negligence of the defendant.

Defendant stated in its answer that it did not know whether or not complainant paid the amount of freight and war tax alleged in the bill, because defendant had nothing to do with said shipment of peanuts from Johnsonville to Norfolk, Virginia, and did not receive any sum further than the freight on 1001 bags of peanuts at twenty cents per bag to Johnsonville as aforesaid, and that defendant received no part of the freight charges for the interstate shipment.

The proof shows that there was a shortage in the shipment of peanuts, when delivered to complainant at Norfolk, substantially as alleged in the bill, but it also appears from the proof, with reasonable certainty, and the Chancellor found, that such loss and damage did not occur while the peanuts were on defendant's boats or in the possession of defendant.

The Chancellor further found, as stated in his decree, "that the shipment of the peanuts in controversy was not an interstate shipment, and hence the United States statute known as the Carmack Amendment does not determine the rights of the parties." This latter finding and adjudication of the Chancellor is challenged by an assignment of error and this presents the determinative question in the case.

It is seen from the averments of complainant's bill, as hereinbefore recited, that complainant bases its suit upon the contract embodied

in the two bills of lading issued by the defendant on March 9, 1918, and March 31, 1918, respectively, as said bills of lading are governed by and are to be construed in connection with the Carmack Amendment to the Interstate Commerce Law. The two bills of lading, so far as they bear upon the issue of law here presented, are the same. The pertinent portions of one of said bills of lading are as follows:

"Read Your Contract.

### "ST. LOUIS AND TENNESSEE RIVER PACKET COMPANY
"(incorporated)
### "PADUCAH PACKET.

"RECIEVED, In Apparent Good Order, except as Noted Below, Contents and Value Unknown, of W. H. Walker, For Shipment on Steamer Kentucky From Cuba Ldg. Tenn., March 9, 1918. To be delivered unto N. C. & St. L. R. R. or assigns at Johnsonville, Tenn.

"On levee or wharfboat or at railroad station or elevator, or in warehouse or on bank of the river at least twenty feet from the water's edge, where this company's liability shall cease, whether the consignee or the landing keeper or the warehouseman meets the boat to receive the goods or not. It is distinctly understood that all goods so delivered are at the owner's risk; he must exercise his rights, be there, or have his agent there, to receive them, and notations must be made on clerk's or boat's discharging book, of any over, shortages or damages, then the book signed by the agent or consignee, if there, if not, by the clerk making delivery, which shall be binding. To be transported from there by any connecting line, Rail or River, and delivered unto American Peanut Corporation or Assigns at Norfolk, Virginia, with privilege of Lightering, Towing, Storing and Reshipping. The dangers of Navigation, known and unknown obstructions, Fire, Explosion, Bridges and Collision excepted, to be delivered on Levee or Wharfboat, or at Company's depot, upon payment of freight at the Rate of 20 cts. per bag to Johnsonville, Tennessee, and charges as below.

"In consideration of the low rate of freight herein named, it is expressly understood and agreed between the shipper and the carrier, that any and all claims for Shorts, Damages or Overcharges shall be made at the point of delivery against the last carrier. It is further clearly understood and agreed by the Shipper, Agent or owner that the St. Louis & Tennessee River Packet Co. shall not be held liable or responsible for delay, loss or damages occurring beyond its own line, that in accepting goods to be transported beyond its own line it acts as agent only for the owner and its obligations cease in every particular when goods are delivered to the connecting carrier, wharfboat or warehouse to be forwarded

to destination. The St. Louis & Tennessee River Packet Co. guarantee the through rate of freight from point of shipment to destination as shown in this bill of lading when properly written in ink by agent of company at time of shipment. But all claims for delay, loss or damage must be made against the carrier in whose possession the goods were at time of such delay, loss or damage. It is further understood and expressly agreed, that liability of St. Louis & Tennessee River Packet Co. while goods are awaiting shipment shall be that of a warehouseman only."

Under the American common law, the normal liability of a connecting carrier is limited to its own line, and the mere acceptance of goods consigned to points beyond the line of the carrier does not operate to extend this liability. A carrier receiving goods marked for delivery beyond his route is prima facie responsible only for his own route, and assumes no liability for safe carriage on connecting lines. In other words the mere fact that the carrier received goods marked for a place beyond its own terminus does not import an agreement to transport the goods to a destination named. 4 R. C. L., p. 883.

And if a common carrier, by stipulation in a bill of lading accepted, limits its liability for the transportation of property to the terminus of its own line (as was done in the instant case), it will not be chargeable with damages occurring on a connecting line, and proof that damages did not occur to the shipment while the goods were in its charge is sufficient to exonerate it from liability. 4 R. C. L., p. 888.

It is quite probable that a recognition of the rules of law just stated impelled the complainant to expressly base its suit upon the Carmack Amendment to the Interstate Commerce Law, for the reason that the Carmack Amendment imposes liability upon the initial carrier of an interstate shipment for loss occurring on the lines of connecting carriers and prohibits all contracts attempting to limit such liability of the initial carrier. It is therefore necessary for us to decide whether the provisions of the Interstate Commerce Act apply to the shipment involved in this case.

The Interstate Commerce Act of 1887, as amended in 1906, provides (in Section 1) "that the provisions of this Act shall apply to . . . any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad (or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment), from one State or Territory of the United States or the District of Columbia, to any other State or Territory of the United States or the District of Columbia."

It appears from the provisions of the Interstate Commerce Act above quoted that (1) interstate commerce wholly by railroad is sub-

ject to the Act; (2) interstate commerce wholly by water is not subject to the Act, and (3) interstate commerce partly by railroad and partly by water, under a common control, management, or arrangement for a continuous carriage or shipment, is subject to the Act.

"The primary purpose of Congress in the passage of the statute was to regulate transportation by railroad. The control of carriers by water was merely incidental and collateral, and they were included so that the regulation of carriers by rail might be effective and not be destroyed by subterfuges and contracts entered into with water lines. When water carriers become amenable to the requirements of the statute and the jurisdiction of the Interstate Commerce Commission, they do so by choice in entering into a common arrangement or control with railroads.

But even when water carriers enter into or adopt a common management, arrangement or control with carriers by rail for continuous transportation, the jurisdiction of the Interstate Commerce Commission only extends to the traffic so carried under a common control. As to traffic by water not transported under such a common control, management, or arrangement, the federal statute does not control and the Commission has no power to regulate it." Roberts Federal Liabilities of Carriers, sec. 92, p. 212.

The fact that the lines of a water carrier and a railway carrier connect and thus form a continuous line of transportation over which traffic moves between two or more States does not bring the water carrier within the control of the Federal Act, unless such carriers are under a "common control," or "common management," or there is between them a "common arrangement for a continuous carriage or shipment."

There is no pretense that the defendant and the railway companies over whose lines the shipment in question passed were under a "common control" or "common management," and we are of the opinion that there was no "common arrangement for a continuous carriage or shipment" within the terms of the Act. The "common arrangement" mentioned in the statute contemplates an agreement between the water carrier and the railway carrier or carriers with respect to the rate or rates to be charged for such continuous carriage and a division of such joint rate. Interstate commerce Commission v. Goodrich Fruit Co., 224 U. S., 194, 56 L. Ed., 729, 735; Mutual Transit Co. v. United States, 178 Fed., 664, 667.

In the instant case, there is no evidence whatever of an arrangement, agreement or understanding between the defendant and N. C. & St. L. Railway Company or any other carrier with respect to a joint rate or a division of rates. The bills of lading issued by the defendant to the complainant's agents contracted for a rate of twenty cents per bag to Johnsonville, all of which was payable to and was

collected by the defendant. The bill of lading contains no mention of the rate or rates to be charged by the railway carrier to which the defendant contracted to deliver the peanuts or the rate to be charged by any connecting carrier. There is no suggestion in the record that the defendant Packet Company was in anywise interested in the rate or rates to be charged and collected for the transportation of the peanuts after defendant delivered them to the N. C. & S. L. Railway Company at Jacksonville, and there is likewise no intimation in the record that the railway carriers were interested in the rate of twenty cents per bag charged and collected by defendant for transporting the peanuts from Cuba Landing and Mousetail Landing, respectively, to Johnsonville. Mutual Transit Co. v. United States, supra, pp. 666-667; Ex Parte Koehler, 30 Fed., 867; Standard Oil Co. of N. Y. v. United States, 179 Fed., 614, 620; 1 Roberts Fed. Liabilities of Carriers, sec. 94, p. 216.

We have read the opinions in the cases of United States v. Wood, 145 Fed., 405, Joest v. Clarendon & Rosedale Packet Co. (Ark.), 183 S. W., 759 and Victor Produce Co. v. Western Transit Co. (Minn.), 160 N. W., 248, cited on behalf of complainant, and we find nothing in those cases which conflicts with the conclusion we have reached in the instant case.

The assignments of error are overruled and the decree of the chancery court dismissing complainant's bill and adjudging the costs against complainant and the surety on his prosecution bond will be affirmed. The costs of the appeal will be adjudged against the complainant and the surety on its appeal bond.

Crownover and DeWitt, JJ., concur.