## CHICAGO, B. & Q. RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. November 8, 1907.)

### No. 2,484.

1. CARRIERS—INTERSTATE COMMERCE—REBATES.

It is not essential to the commission of the offense of giving a concession from a through rate over connecting lines of railroad, under the Elkins Act of February 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880], that the rate be a joint one established by all of the carriers and published and filed with the Interstate Commerce Commission. If an initial carrier accepts traffic for transportation, and issues its bill of lading over a route made up of connecting roads for which no joint through rate has been published and filed with the commission, the lawful rate to be charged is the sum of the established local rates published and filed by the individual roads; or if there is a local rate over one road and a joint rate over the others for the remainder of the route, all published and filed with the commission, the lawful through rate to be charged is the sum of the local and joint rates.

2. SAME—CONNECTING CARRIERS—COMMON ARRANGEMENT FOR THROUGH SHIPMENTS.

In the concert of action, in the successive receipt and movement of traffic by connecting carriers under through bills of lading for continuous carriage, is manifested the common arrangement contemplated by the interstate commerce laws, and no previous formal contract is necessary to bring the carriers under the provisions of the law.

3. SAME—INDICTMENT FOR GIVING REBATES—SUFFICIENCY.

An indictment charging an interstate carrier with giving a concession whereby a shipper secured through transportation of property between two points at less than the lawful rate is not insufficient because it does not aver the through rate, where it states the amount of the concession and that it was given from the lawful rate over a certain part of the route, which rate is also given.

4. SAME—REBATES—EFFECT OF CONTRACT WITH SHIPPER FOR STATED TIME.

The acceptance by an initial carrier of a through shipment to be carried at less than the lawful rates is not rendered lawful by the fact that such carrier had a contract with a connecting carrier whose line formed a part of the through route that the latter would not increase its rate during a certain time and on the faith of such contract made a similar contract with the shipper, where in the meantime the connecting carrier had in fact published and filed with the commission a new schedule increasing the rate.

In Error to the District Court of the United States for the Western District of Missouri.

Hale Holden and O. H. Dean (O. M. Spencer, W. D. McLeod, and H. C. Timmonds, on the brief), for the plaintiff in error.

A. S. Van Valkenburgh, U. S. Atty. (Leslie J. Lyons, Asst. U. S. Atty., on the brief).

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

HOOK, Circuit Judge. The Chicago, Burlington & Quincy Railway Company was indicted, convicted, and fined for violations of the amendment to the interstate commerce law, commonly known as the "Elkins Act" (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880]), in giving to certain packing companies concessions from established rates of transportation between Kansas City, Kan., and New York City and Hoboken, N. J., on packing-house products destined for export. In Armour Packing Co. v. United States, 82 C. C. A. 135, 153 Fed. 1, we affirmed judgments against the packing companies for receiving the concessions which the Burlington Company is charged with giving. Most of the contentions of the Burlington Company in the case at bar may be disposed of by reference to the opinion in the Armour Case. We there held (1) that the act of Congress applied to transportation within the United States of property in foreign commerce, though being carried under a through bill of lading from the point of origin within the United States through the port of transshipment to the foreign destination. (2) Though property is destined for export to a nonadjacent foreign country the rate or rates of transportation from the point of origin within the United States to the port of transshipment, if separable from the through rate, are within the act of Congress, and must be published and filed with the commission, and that a concession in respect thereof is a violation of the law. That this is so although the rate specified in the bill of lading is one through rate to the foreign destination made up by the initial carrier by combining the rate or rates from the place of origin to the port of transshipment with the cost of ocean carriage. (3) That as so construed the act of Congress is not in contravention of paragraphs 5 and 6 of section 9 of article 1 of the national Constitution, providing that "no tax or duty shall be laid on articles exported from any state," and that "no preference shall be given by any regulation of commerce or revenue to the ports of one state over those of another." (4) That the giving or receiving of a concession in violation of the Elkins act whereby transportation is thereafter obtained is a continuing offense, and a prosecution therefor may be maintained in any jurisdiction through which the transportation is conducted. Therefore, though the shipments in question originated in Kansas, the prosecution was maintainable in the Western district of Missouri, through which the property was transported at the unlawful rate. (5) That it is nevertheless an offense though the concession was from a component part of a single through rate. (6) That a contract between a carrier and a shipper that a rate then lawful should be maintained for a fixed period must yield to a subsequent increase of the rate by the carrier and the publication and filing thereof with the commission in accordance with the act of Congress, otherwise the equality

sought by the law would be frustrated, and advantage would rest with those who were secretly favored or were diligent to make private contracts with carriers. (7) That no device in the sense of a pretext or artifice, such as false billing, classification, weighing, or the like, is essential to the giving or receiving of a concession contrary to the Elkins act. The phrase "by any device whatever" found in section 1 of the act means "directly or indirectly, in any way whatever." (8) That an intent to commit an offense of this character is shown by a conscious, intentional doing of that which the law prohibits.

There remain to be considered some questions which were not involved in the Armour Case. It is contended by the Burlington Company that the indictment did not charge a public offense, in that it failed to allege any joint tariff or any published schedule of joint tariffs from Kansas City to New York or elsewhere, and failed to allege what, if any, the rate was between those points. The first count of the indictment may be taken as fairly illustrating the point of this attack. It sets forth that the Burlington Company was a railroad corporation engaged in the transportation of property from Kansas City, Kan., to New York City, under contracts, agreements, and arrangements with connecting railroads, including the Toledo, St. Louis & Western, the New York, Chicago & St. Louis, the Lehigh Valley, and the Grand Trunk Western, and was therefore a corporation common carrier subject to the interstate commerce act and the acts amendatory thereof; that on August 17, 1905, the Armour Packing Company delivered 50 tierces of lard, weighing 21,567 pounds, to the Burlington Company at Kansas City, Kan., for transportation by it and its connecting railroads through and beyond the Western district of Missouri to New York City, for export, and that the same were so transported; that there had theretofore been filed by the Burlington Company and its connecting railroads with the Interstate Commerce Commission as required by law "certain tariffs and rates and certain joint schedules, tariffs and rates showing the legal rates and charges established by the said common carrier and its said connecting railroads and in force at the time upon their said routes"; "that said tariffs and rates and joint tariffs and rates for that part of said routes from the Mississippi river, that is to say, from East St. Louis in the state of Illinois, to New York City," were made, published, and filed by the said connecting railroads, and that the Burlington Company in respect of such shipments "was a party to and bound by the rates and schedules and joint tariffs and schedules published and filed by said connecting railroads"; that said rates and schedules and joint rates and schedules "showed that the legal rates and charges established for the transportation of said property over said connecting lines of railroad for that part of the route lying east of the Mississippi river to New York City" was 35 cents per hundred pounds but that the Burlington Company unlawfully gave to the Packing Company a concession of 12 cents of said rate for that part of the route east of the Mississippi river upon every hundred pounds of the property so transported, whereby the transportation from Kansas City to New York City was at a rate of 12 cents per hundred pounds less "than the rate named in

the tariffs and schedules and joint tariffs and schedules published and filed" with the commission.

It is true that there is no averment in the indictment of a through joint rate from Kansas City to New York. Indeed, the inference from the language used is that there was no such rate, and that what was claimed by the government to be the lawful through rate was a combination of the rates that had been established over the component sections of the entire route. It is not essential to the commission of the offense of giving a concession from a through rate over connecting lines of railroad that the rate be a joint one established by all of the carriers and published and filed with the commission. If an initial carrier accepts traffic for transportation and issues its bill of lading over a route made up of connecting roads for which no joint through rate has been published and filed with the commission, the lawful rate to be charged is the sum of the established local rates published and filed by the individual roads; or if, as was the case here, there is a local rate over one road and a joint rate over the others for the remainder of the route, all published and filed with the commission, the lawful through rate to be charged is the sum of the local and joint rates. By failing to establish or concur in a joint through rate for traffic accepted for interstate transportation, each participating carrier impliedly asserts that the rate which it has duly established, published, and filed for its own line shall be a component part of the through rate to be charged. It is competent for carriers, if conditions justify it, to make their proportions of a through rate less than the local charges upon their own lines, but in doing so they should observe legal methods, and if no action to that end is taken they in effect adhere to the rates established, published, and filed by them as applying not only to local but to through traffic. The initial carrier which receives traffic and issues a bill of lading to ultimate destination should be held to have done so in view of the only rates which its connections are authorized by law to charge. This principle was recognized by the commission as early as March 23, 1889 (2 Interst. Com. Com'n R. 656), when it said:

"When no other tariff is filed, the rates on traffic carried over or upon more than one line will be the sum of the local rates of the individual roads, or of local and joint rates, as the case may be."

By routing and billing the traffic over the connecting lines the initial carrier adopts and is bound by their lawful rates. In the concert of action, in the successive receipt and movement of the traffic by the connecting carriers under through bills of lading for continuous carriage, is manifested the "common arrangement" contemplated by the act of Congress. No previous formal contract is necessary to bring the carriers under the provisions of the law. Thus, in Cincinnati, etc., Railway v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935, it was held that the arrangement constituting participation by a local carrier in interstate commerce is effected by its receipt and transportation of interstate traffic under through bills of lading. In United States v. Wood (D. C.) 145 Fed. 405, there were ship-

ments of iron pipe under through bills of lading from points in Pennsylvania and New Jersey to Winnipeg, Canada. The route was over the Philadelphia & Reading and Baltimore & Ohio Railroads from the points of origin to the Great Lakes, thence by water carrier to Duluth, Minn., and thence by the Great Northern Railroad and its connections to destination. No through joint rate had been published or filed for the entire route, but there had been published and filed by the first two railroads and the water carrier a joint rate from the initial points to Duluth, and by the Great Northern and its connections a joint rate from Duluth to Winnipeg. It was held that the lawful through rate was the sum of the two joint rates, and that each carrier which accepted and transported the traffic under through bills of lading at a through rate participated therein and was bound thereby. The doctrine was reasserted by the same court in United States v. Camden Iron Works (C. C.) 150 Fed. 214.

The failure to specify the through rate from Kansas City to New York did not render the indictment bad. It is specifically charged that a concession was given whereby the Packing Company secured transportation of its property from Kansas City to New York at a rate 12 cents less than the lawful rate, and it was definitely pointed out that the concession was given and received in respect to that part of the through route lying east of the Mississippi river, the lawful rate therefor being specified and also the amount of the concession. In our opinion this was sufficient. The indictment disclosed all the elements of the offense, and it was sufficiently definite to apprise the accused of the charge it had to meet and to protect it from a second prosecution.

It is also contended that the evidence was insufficient to warrant conviction. The following facts were undisputed: The route of the shipments was from Kansas City to St. Louis via the Burlington Railroad, thence via the Toledo, St. Louis & Western Railroad to eastern connections, thence by one or more of those connections to New York City or Hoboken, N. J., and thence by ocean carrier to foreign destination. Contracts for the ocean carriage were made by the packing companies direct with steamship companies, and then turned over to the Burlington Company, which added the rate fixed in the contracts to the rate made by it from Kansas City to the seaboard. When the shipments were made the Burlington Company had in force a rate, filed with the commission, from Kansas City to St. Louis, of 13½ cents per hundred pounds "when destined east of the Indiana-Illinois state line." By the very terms of the tariff sheet this rate was applicable to the shipments in question. At the same time the Toledo, St. Louis & Western Company had in force and filed with the commission a rate of 35 cents over its line and eastern connections from St. Louis to New York City and Hoboken. The Burlington Company had not joined in the making of this latter rate, nor had it filed a concurrence with the commission. It did, however, have in force the same rate over its own line through Upper Mississippi points and over the same eastern connections of the Toledo, St. Louis & Western. No joint through rate from Kansas City to New York and Hoboken over the route taken by the shipments in question had been filed with the commission. The sum of the two

rates—that is to say, from Kansas City to St. Louis and from St. Louis to the seaboard—was 48½ cents. In this state of affairs the Burlington Company received the traffic at Kansas City, routed it over the lines of road mentioned, issued a through bill of lading at a single through rate of 33 cents (excluding the contract rate for ocean carriage), or 15½ cents less to the seaboard than the sum of the rates which the participating carriers could lawfully charge for carriage over their respective parts of the route. The Burlington Company collected from the packing companies the entire charge for through transportation. It is contended by the Burlington Company that it did not participate in the rate east of St. Louis,' and that it was not' bound thereby. What we have already said upon this subject in considering the sufficiency of the indictment disposes of this contention.

The shipments in respect of which the offenses were charged to have been committed were made between August 16 and September 19, 1905. On June 17, 1905, the Toledo, St. Louis & Western Company and its eastern connections had in force between St. Louis and New York City and Hoboken a published and filed rate of 23 cents. The Burlington Company claims that it secured a contract from an authorized representative of those companies not to increase the rate during the remainder of the year. It will be assumed for present purposes that the proofs sustain the claim. Relying upon the maintenance of this rate, it thereupon contracted with the packing companies to transport their products over the route mentioned until December 31, 1905, at a through rate from Kansas City of 33 cents. It will also be assumed that the Burlington's established rate to St. Louis plus the 23-cent rate thence to the seaboard exactly equalled the 33-cent rate quoted the packing companies. It may be observed in passing that these contracts do not appear to have been published or filed with the commission. On July 25, 1905, the Toledo, St. Louis & Western Company by filing with the commission a supplement to its schedules and tariffs raised the rate from St. Louis to the seaboard from 23 to 35 cents, effective August 7th, and whilst the latter rate continued to be the one shown by the records of the commission the Burlington Company continued to accept and route the traffic from Kansas City to the seaboard at the 33-cent rate. It now contends that its contract with the roads east of St. Louis for the maintenance of the rate of 23 cents over their lines was a lawful one, and that it could not be affected in its relations with the packers and its duties to them by an abandonment of the contract to which it did not assent. This is substantially the question determined in the Armour Case. There the packing companies relied on their contracts with the Burlington; here the Burlington relies on its contract with the Toledo, St. Louis & Western and its eastern connections. Our views upon the efficacy of such contracts have already been expressed.

It is also contended that the trial court erred in admitting in evidence certain tariffs filed by the Burlington Company for routes to the seaboard other than that over which the shipments in question moved. Even if the action of the Burlington Company in this particular were not admissible on the question of its good faith and intent, still it

must be said that the uncontradicted evidence showed that it did those things which constituted a violation of the law, and the reception in evidence of the other tariffs clearly caused no injury.

The judgment is affirmed.