## STANDARD OIL CO. OF NEW YORK v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit.   May 2, 1910.)

### No. 199.

1. CARRIERS (§ 38*)—VIOLATION OF INTERSTATE COMMERCE ACT—INDICTMENT OF SHIPPER FOR RECEIVING CONCESSIONS.

An indictment of a shipper for receiving rebates or concessions in violation of Elkins Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 (U. S. Comp. St. Supp. 1909, p. 1138), prohibiting the granting or receiving of any rebate or concession whereby property shall by any device whatever be transported in interstate commerce for less than the filed and published rates, which charges that defendant received a concession from such rates on a specified shipment, is sufficiently specific and need not specifically charge the actual payment of the unlawful lower rate, which is a matter of proof.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

2. COMMERCE (§ 33*)—SUBJECTS OF REGULATION—TRANSPORTATION OF GOODS —INTERSTATE COMMERCE ACT—SHIPMENTS MADE UNDER "COMMON ARRANGEMENT."

Under the provision of Interstate Commerce Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), that "the provisions of this act shall apply to any common carrier or carriers engaged in the transportation of passengers or property * * * under a common control, management or arrangement for a continuous carriage or shipment from one state * * * to any other state," as a general rule a "common arrangement" is established by proof of a shipment under a through bill of lading and a continuous interstate carriage thereunder, coupled with proof of concerted action among the connecting carriers with regard to the payment of the charges and the receipt and movement of the traffic, even if an agreed division of a single through rate is not shown.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 26;  Dec. Dig. § 33.*]

3. COMMERCE (§ 33*)—SUBJECTS OF REGULATION—TRANSPORTATION OF GOODS —INTERSTATE COMMERCE ACT—"THROUGH BILL OF LADING."

A bill of lading which acknowledges the receipt of merchandise consigned to a point in another state, names the route and railroads over which the shipment is to be made, contains an agreement by the initial carrier to deliver to the next connecting carrier, and provides that as to each carrier upon the route the service is to be rendered in accordance with the conditions stated therein, is a "through bill of lading," having reference to the usual method in use by connecting carriers.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 26;  Dec. Dig. § 33.*]

4. CARRIERS (§ 38*)—INTERSTATE COMMERCE ACT—CONCERT OF ACTION AMONG CARRIERS.

Evidence considered, and *held* sufficient to support a finding that there was a concert of action among the connecting carriers transporting an interstate shipment of merchandise in respect to the charges and the through movement of the traffic, the entire carriage having been made under a "blind" bill of lading issued by the initial carrier, which did not name its own nor a through rate.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

5. CARRIERS (§ 30*)—INTERSTATE COMMERCE ACT—JOINT TARIFFS—APPLICATION.

A tariff rate between two points on different railroads, filed and published by one company and concurred in by the other, which does not

designate any particular route, must be held as a matter of law to apply to the natural and direct route over the lines of the two companies between the designated points, and to constitute the lawful rate over such route.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 81; Dec. Dig. § 30.*]

6. CARRIERS (§ 38*)—INTERSTATE COMMERCE ACT—PROSECUTION OF SHIPPER FOR RECEIVING CONCESSIONS—SUFFICIENCY OF EVIDENCE.

Evidence *held* sufficient to support a verdict finding that defendant knowingly accepted concessions as a shipper from the lawful rates established by railroad companies in violation of Elkins Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 (U. S. Comp. St. Supp. 1909, p. 1138).

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

7. CARRIERS (§ 51*)—BILLS OF LADING—"BLIND BILLING."

The act of shipping without stating the charges is called "blind billing."

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 51.*]

In Error to the District Court of the United States for the Western District of New York.

The Standard Oil Company of New York was convicted of a criminal offense, and it brings error. Affirmed.

See, also (D. C.) 158 Fed. 536.

Writ of error to review a judgment of the District Court, Western district of New York, entered upon the verdict of a jury finding the defendant guilty of violations of the act to further regulate commerce of February 19, 1903, commonly known as the "Elkins Act." Act Feb. 19, 1903, c. 708, 32 Stat. 847 (U. S. Comp. St. Supp. 1909, p. 1138). In the following statement and opinion the parties are designated as in the court below.

There are 40 counts in the indictment and the offense charged in each of them is the acceptance of a concession from published and filed tariffs on the interstate transportation of petroleum. Each count covers the transportation of a car load of oil on a date between August 15, 1904, and May 17, 1905. In 28 counts the transportation is between Olean, N. Y., and Rutland, Vt., and in the remaining 12 counts, between said Olean and Bellows Falls, Vt. The allegations of a typical indictment are, in substance, that the Pennsylvania Railroad Company, the New York Central & Hudson River Railroad Company, and the Rutland Railroad Company were common carriers engaged in the transportation of property over their connecting railroads from Olean, N. Y., to Rochester, N. Y., thence to Norwood, N. Y., and thence to Rutland, Vt., under a common arrangement for continuous carriage; that the published and filed tariff and, consequently, the lawful rate of the Pennsylvania and New York Central Railroads for the transportation of petroleum was 26½ cents from Olean to Norwood, and that the rate of the Rutland road from Norwood to Rutland was $28 per tank car; that the defendant knew the foregoing facts; that the said common carriers, at the defendant's request, unlawfully transported over said route a car load of oil in a tank car at a rate lower than that named in said tariff; and that thereby the defendant knowingly accepted and received a concession in violation of the statute.

The following is a statement of the facts in the case which are undisputed, although the parties draw different inferences therefrom:

The shipments in question were made on orders sent to the Vacuum Oil Company, a corporation doing business at Olean, N. Y., by the defendant through its agents in Vermont. The shipments were delivered by the Vacuum Company to the Pennsylvania Railroad at Olean. With each shipment the Vacuum Company delivered to the railroad agent a shipping order and bill of lading; one being a duplicate of the other. The agent retained the shipping order and signed the receipt on the bill of lading and returned the lat-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ter to the Vacuum Company. The Vacuum Oil Company indicated in its shipping order and bill of lading the route which the transportation should take, viz., by the Pennsylvania to Rochester, by the New York Central to Norwood, and by the Rutland Railroad to Rutland.[1] At the time of each shipment a postal card was sent by the Vacuum Company to the defendant's agent at the place of destination notifying him of the shipment. These notices stated the aforesaid route as that over which the shipments would move.

The waybill contained no statement of the rate, but did contain the following direction: "Agent N. Y. C. and H. R. R. R., Rochester, N. Y., prepay charges from Rochester to Norwood and charge to the Standard Oil Company of New York." This method of billing, without stating the charges, is called "blind billing."

When the car arrived at Rochester it was transferred from the Pennsylvania to the New York Central tracks, and a transfer card was delivered from the one railroad to the other. Thereupon the New York Central's agent made out a waybill covering the transportation from Rochester to Norwood, and sent the same to the Central's agent at Norwood. This waybill stated the rate and the aggregate freight charge for the transportation between Rochester and Norwood. At Norwood the car was switched from the Central's tracks to the tracks of the Rutland Railroad, and by that road was hauled to the Vermont points and delivered to the defendant's agents.

The rate charged by and paid to the Pennsylvania for the transportation from Olean to Rochester was 9 cents per barrel; to the New York Central for the transportation from Rochester to Norwood, 9 cents per hundred pounds, and to the Rutland Railroad for the transportation from Norwood to Rutland, $28 per tank car. This 9 cents per barrel rate of the Pennsylvania road was under a rate order in force at the time of the shipments which was marked "not to be posted," and was not published or filed. The 9 cents per hundred pounds rate of the New York Central was under an unpublished rate order also marked "not to be posted," and which was in force at the time of the shipments. This rate, however, applied only to shipments destined to points on the Rutland road beyond Norwood. No tank shipments were made to Norwood, and the rate upon all shipments which stopped at Norwood was higher. The rate paid the Rutland road was in accordance with its lawfully filed tariff.

The tariff upon petroleum and its products from Olean, N. Y., to Norwood, N. Y., as published and filed with the Interstate Commerce Commission by the Pennsylvania Railroad in April, 1904, was at the rate of $26\frac{1}{2}$ cents per hundred pounds. A concurrence in this rate was duly filed with the Commission by the New York Central Railroad. No revocation of this tariff or of the concurrence therein had been made prior to the shipments in ques-

---

[1] The following is a copy of the material parts of a bill of lading:

"Received from Vacuum Oil Co., by Pennsylvania Railroad Co., the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned and designated as indicted below, which said company agrees to carry to the said destination, if on its road, otherwise to deliver to another carrier on the route to said destination.

"It is mutually agreed, in consideration of the rate of freight hereinafter named, as to each carrier of all or any of said property, over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder, shall be subject to all the conditions, whether printed or written, herein contained, and which are hereby agreed to by the shipper and by him accepted for himself and assigns as just and reasonable. Upon all the conditions, whether printed or written herein contained, it is mutually agreed that the rate of freight from ———— to ———— is to be in cents per 100 pounds.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Consignee, Standard Oil Company,
"Destination, Rutland, Vt.
"Penna. RR—Roch—NYC—Norwood—Rut. R. R.
   "Agent Olean, N. Y. Blind Bill to Rochester, N. Y.
             "Description of Articles

\* \* \* \* \* \* \* \* \* \* \* \*

          "Tanks Refined Oil UTL 7295
"Agent Rochester, N. Y., prepay through to Norwood and charge to Standard Oil Co. of New York.
   \* \* \* \* \* \* \* \* \* \* \* \* \* \*
"The conditions upon which the above mentioned property is received for transportation are printed on the back hereof."

tion, and no other tariffs of the Pennsylvania and Central roads concerning rates for the transportation of oil between Olean and Norwood, or by either road for part of the distance, were filed with the Commission during the time of such shipment. It did not appear, however, that any shipments of oil had ever been made from Olean to Norwood at the 26½-cent rate. This rate upon the shipments in question amounted to much more than the rate actually charged and paid.

There were two possible routes over which shipments could have moved from Olean to Norwood. One was the fairly direct route by way of Rochester which the shipments actually took. Another was a more roundabout route over the Pennsylvania from Olean to Buffalo, and thence over the New York Central by way of Suspension Bridge and Charlotte, N. Y., to Norwood. The published tariff did not designate the route which shipments made thereunder should take, but contained the following statement: "Route in accordance with agreed percentages and as designated within." It did not appear that any oil was ever carried over the route by way of Buffalo.

Other material facts are stated in the opinion.

Kenefick, Cooke & Mitchell (Daniel J. Kenefick and Martin Carey, of counsel), for plaintiff in error.

S. Wallace Dempsey, Special Asst. U. S. Atty.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above). The question raised by the defendant in this case may be conveniently considered in the order stated in its brief. In the first place, the defendant contends that the indictment was insufficient in that it failed to allege payment of the alleged unlawful rate, and that proof of the payment of such rate was erroneously received. This question was raised by demurrer, and was preserved on the trial by motions to dismiss. Evidence of payment of the rate was offered upon the trial and was received over the defendant's objection and exception.

The statute under which the indictment was framed (section 1 of the act of February 19, 1903, known as the "Elkins Act") as it existed at the time of these transactions, is printed in the footnote.[2]

---

[2] "Section 1. * * * The willful failure upon the part of any carrier subject to said acts to file and publish the tariffs or rates and charges required by said acts or strictly to observe such tariff until changed according to law, shall be a misdemeanor, and upon conviction thereof the corporation offending shall be subject to a fine of not less than one thousand dollars nor more than twenty thousand dollars for each offense; and it shall be unlawful for any person, persons, or corporation to offer, grant, or give or solicit, accept, or receive any rebate, concession, or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereto whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced. Every person or corporation who shall offer, grant, or give or solicit, accept, or receive any such rebates, concession, or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than one thousand dollars nor more than twenty thousand dollars. In all convictions occurring after the passage of this act for offenses under said acts to regulate commerce, whether committed before or after the passage of this act, or for offenses under this section, no penalty shall be imposed on the convicted party other than the fine prescribed by law, imprisonment wherever now prescribed as part of the penalty being hereby abolished. Every violation of this section shall be prosecuted in any court of the United States having jurisidiction of crimes within the district in which such violation was committed or through which the transportation may have been conducted, and whenever the offense is begun in one jurisdiction and completed in another it may be dealt with, inquired of, tried, determined, and punished in either jurisdiction in the same manner as if the offense had been actually and wholly committed therein."

The portions especially relevant to the questions now under consideration are these:

"It shall be unlawful for any * * * corporation to * * * accept or receive * * * any concession * * * in respect of the transportation of any property in interstate * * * commerce by any common carrier * * * whereby any such property shall, by any device whatever, be transported at a less rate than that named in the tariffs published and filed by such carrier."

The indictment in the several counts charges that the common carriers transported the property in question for the defendant; that its transportation was interstate commerce; that the transportation papers showed a rate and charge less than the lawfully filed rate for such service, and that the rate charged to the defendant was less than the lawful rate which it should have paid. The indictment then charges that the defendant, in the manner stated, "did knowingly accept and receive" from the common carriers a concession in respect to the transportation of its property in interstate commerce.

It will be observed that the indictment follows, substantially, the language of the statute. The gist of the offense charged was the receipt of the concession, and that is expressly alleged. The other statutory elements of the offense are also fully stated. The indictment fairly informed the defendant of the offense charged against it, and of that which it was called upon to meet at the trial. Acts are set forth with reasonable particularity of time, place, and circumstance. The indictment seems clearly to be sufficiently definite and certain to enable a conviction under it to be pleaded in bar of any subsequent prosecution for the same cause. While it is not always enough to charge statutory offenses in the language of the statute, and while it may not be sufficient to charge violations of this statute in its language alone, we think this indictment states the offense charged with all the particularity required.

In the very recent case of Armour Packing Co. v. United States, 209 U. S. 56, 83, 28 Sup. Ct. 428, 436 (52 L. Ed. 681)—a prosecution under the Elkins act—the Supreme Court said:

"It is alleged that the indictment is insufficient, in that it fails to set out the kind of device by which traffic was obtained, and of what the concession consisted, and how it was granted. Authorities are cited to the proposition that in statutory offenses every element must be distinctly charged and alleged. This court has frequently had occasion to hold that the accused is entitled to know the nature and cause of the accusation against him, and that a charge must be sufficiently definite to enable him to make his defense and avail himself of the record of conviction or acquittal for his protection against further prosecution and to inform the court of the facts charged, so that it may decide as to their sufficiency in law to support a conviction, if one be had, and the elements of the offense must be set forth in the indictment with reasonable particularity of time, place and circumstance. And it is true it is not always sufficient to charge statutory offenses in the language of the statutes, and where the offense includes generic terms it is not sufficient that the indictment charge the offense in the same generic terms, but it must state the particulars. United States v. Hess, 124 U. S. 483 [8 Sup. Ct. 571, 31 L. Ed. 516]; Evans v. United States, 153 U. S. 584 [14 Sup. Ct. 934, 38 L. Ed. 830]. But an indictment which distinctly and clearly charges each and every element of the offense intended to be charged, and distinctly advises the defendant of what he is to meet at the trial, is sufficient."

And in the still later case of New York Central R. R. v. United States, 212 U. S. 481, 497, 29 Sup. Ct. 304, 308 (53 L. Ed. 613)—another prosecution under the same act—the Supreme Court said:

"Objections were made to the sufficiency of the indictment based upon its want of particularity in describing the offense intended to be charged. Section 1025 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 720) provides that no judgment upon an indictment shall be affected by reason of any defect or imperfection in matter of form which shall not tend to the prejudice of the defendant, and, unless the substantial rights of the accused were prejudiced by the refusal to require a more specific statement of the manner in which the offense was committed, there can be no reversal. Connors v. United States, 158 U. S. 408, 411 [15 Sup. Ct. 951, 39 L. Ed. 1033]; Armour Packing Co. v. United States, 209 U. S. 56, 84 [28 Sup. Ct. 428, 52 L. Ed. 681]. An examination of the indictment shows that it specifically states the elements of the offense with sufficient particularity to fully advise the defendant of the crime charged and to enable a conviction, if had, to be pleaded in bar of any subsequent prosecution for the same offense."

But it is urged that the Circuit Court of Appeals for the Seventh Circuit in the case of Standard Oil Company of Indiana v. United States, 164 Fed. 376, 90 C. C. A. 364, held that the consummation of the offense of accepting a concession is the payment of the alleged unlawful rate; that payment is an essential ingredient of the offense and that the present indictment is insufficient because it fails to specifically aver that payment of the unlawful rate was made. We are inclined to think that payment must necessarily be inferred from any reasonable interpretation of the language of the indictment. But it is unnecessary to so decide. As already shown, the offense charged was the acceptance of a concession. Proof of payment might be necessary to show the fact of the concession. There might be no concession established until payment should be shown. But it does not follow that it was necessary in charging the concession, to plead the evidence required to prove it. And we think the decision referred to entirely consistent with these views. In that case Judge Grosscup said (p. 385):

"The offense denounced in the statute, and charged in the indictment, is the accepting by the plaintiff in error of a concession in respect to the transportation of property in interstate commerce, whereby such property was transported at a less rate than that named in the tariffs published and filed. * * * And there is no basis in the statute for holding that in the case of accepting a concession the transaction is consummated, and the door of repentance is closed, at any earlier moment than in the case of accepting a rebate. So proof that a shipper has agreed to accept a concession—stopping there—whether the proof be embodied in way bills, or book entries, or formal contracts, will not support an indictment for accepting a concession, until the intended wrong becomes an accomplished fact. Of course the irrevocable may be reached and the transaction consummated in other ways than by money settlements, as by the offsetting of mutual accounts. The point is that the transaction, as a transaction, must be consummated."

It is evident that what the court was considering was the "proof" required to establish the concession alleged in the indictment to have been accepted. There is no intimation that it was necessary to plead such proof. The court said that evidence of payment of the unlawful rate was necessary to show a consummated transaction, and, consequently, the evidence of payment which was offered in the present

case was properly received. There was no error in overruling the demurrer or in admitting the evidence.

The second contention of the defendant is that the proof failed to establish that the carriers engaged in this transportation under a common arrangement for the continuous interstate carriage and shipment of the oil. The Elkins act applies only to common carriers subject to the provisions of the act to regulate commerce, and the first section of the latter act, as it existed at the time of the transactions in question, provided:

"That the provisions of this act shall apply to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used, under a common control, management or arrangement for a continuous carriage or shipment, from one state * * * of the United States * * * to any other state * * * of the United States."

It is not contended that the carriers in this case were under any "common control or management." So the inquiry is whether there was a "common arrangement" among them within the meaning of the statute. And this involves at the outset an inquiry as to the meaning of the phrase "common arrangement."

In the very recent case of Mutual Transit Co. v. United States (decided by this court April 4, 1910) 178 Fed. 664, we had occasion to consider the meaning of this phrase. In that case the question was whether a water carrier had entered into a common arrangement with railroad carriers for the transportation of certain freight. We stated that the evidence might have been sufficient to establish a common arrangement had it not been shown that the real antecedent contract was entirely inconsistent with the inferences naturally to be drawn from such evidence. With respect to the meaning of the phrase we said:

"The phrase 'common arrangement,' in view of its context, evidently means an agreement or understanding between connecting carriers with respect to the transportation of merchandise and the charges and the division of the charges to be made therefor. * * * It is not necessary that a 'common arrangement' should be established by proof of formal concurrences in tariffs and division sheets. In the absence of a prior special agreement we think that a 'common arrangement' might be established by receiving and carrying freight under a through bill of lading stating a division of the charges."

The case, however, which is more applicable to the facts in this case is the leading case of Cincinnati, New Orleans & Texas Pacific Ry. v. Interstate Commerce Commission, 162 U. S. 184, 193, 16 Sup. Ct. 700, 704, 40 L. Ed. 935, commonly called the "Social Circle Case." In that case it was held that when a state railroad whose road lies within the limits of a state enters into the carriage of foreign freight by receiving the goods on foreign through bills of lading, and participates in through rates and charges, it becomes a party to a common arrangement for continuing interstate carriage and is subject to the provisions of the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), Mr. Justice Shiras said:

"All we wish to be understood to hold is that when goods shipped under a through bill of lading, from a point in one state to a point in another, are

received in transit by a state common carrier, under a conventional division of the charges, such carrier must be deemed to have subjected its road to an arrangement for a continuous carriage or shipment within the meaning of the act to regulate commerce. When we speak of a through bill of lading we are referring to the usual method in use by connecting companies, and must not be understood to imply that a common control, management or arrangement might not be otherwise manifested."

See, also, Louisville, etc., R. Co. v. Behlmer, 175 U. S. 648, 20 Sup. Ct. 209, 44 L. Ed. 309.

But while these decisions say that a common arrangement may be shown by shipments under a through bill of lading and an agreed division of the charges, it is clear, as pointed out by Mr. Justice Shiras, that such an arrangement might be shown in other ways. Even if an agreed division of a single through rate were not shown, we are satisfied that, as a general rule, a common arrangement would be established by proof of a shipment under a through bill of lading and continuous interstate carriage thereunder coupled with proof of concerted action among the connecting carriers with regard to the payment of the charges and the receipt and movement of the traffic. We approve the language of the Circuit Court of Appeals for the Eighth Circuit in Chicago, Burlington, etc., R. R. v. United States, 157 Fed. 833, 85 C. C. A. 194:

"In the concert of action, in the successive receipt and movement of the traffic by the connecting carriers under through bills of lading for continuous carriage, is manifested the 'common arrangement' contemplated by the act of Congress."

We shall therefore consider the question whether there was evidence to warrant the jury in finding a common arrangement in this case along the following lines: (1) Were the shipments made upon through bills of lading? (2) Was there continuous interstate carriage of the freight? (3) Was there concert of action among the carriers with respect to the charges and the interstate movement of the traffic?

As already shown, the bill of lading in this case (one being typical of all) acknowledges the receipt of the oil by the initial carrier at Olean, N. Y., and contains its agreement to deliver to the connecting carrier upon the route. It provides that as to each carrier upon the route the service is to be performed in accordance with the conditions stated therein. The consignee named is the Standard Oil Company. The destination is Rutland, Vt. The route is by the Pennsylvania road to Rochester, by the New York Central Railroad to Norwood, and by the Rutland road to destination. Several conditions on the back relate entirely to transportation over connecting roads. Now, in the extract from the decision in the "Social Circle Case" already quoted, Mr. Justice Shiras said:

"When we speak of a through bill of lading we are referring to the usual method in use by connecting companies."

As thus described, we have no doubt that the bill of lading in this case was a through bill of lading. We are satisfied that it was in the form usually employed by connecting railroads and it was the only bill of lading which covered the shipment from its beginning in the state of New York to its end in the state of Vermont. We think that a bill

of lading in which the initial carrier should agree to carry the freight through to its destination beyond its own road—which the defendant contends is the only possible through bill of lading—would be unusual in its nature, and that the application of the decisions to which we have referred is not confined to cases of such bills. Indeed, even if we use exact terms, we are not at all certain that a bill of lading covering a shipment from point of origin to place of destination is any less a through bill of lading because it limits the liability of the initial carrier. In Houston Navigation Co. v. Insurance Co. of North America, 89 Tex. 1, 8, 32 S. W. 889, 891 (30 L. R. A. 713, 59 Am. St. Rep. 17), the Supreme Court of Texas said:

"It has been generally held that where a carrier in one state receives a commodity for shipment by a continuous trip over its own line and connecting lines, giving a through bill of lading to the point of destination with the provision that its own liability shall cease upon delivery to its connecting line at a point within the state where it was received, such transportation is to be considered as interstate commerce, and the carrier is but one of several agencies employed."

Upon the question whether there was a continuing carriage of this freight from Olean to Rutland, there is little room for discussion. It is not disputed that each tank car was hauled in the condition in which it was when delivered to the initial carrier to the point of destination continuously and without any unnecessary delay.

We have it, then, undisputed that a continuous interstate transportation service was rendered under what, as a matter of law, amounted to a through bill of lading, and the next inquiry is whether there was evidence to warrant the jury in finding the necessary concerted action among the carriers.

It is clear that there was evidence to warrant the finding that there was an agreement between the defendant and the different carriers before the shipments were made. The shipments were "blind billed"; i. e., no rate was designated by the Pennsylvania from Olean to Rochester, which must have been the result of a previous arrangement. The charges of the New York Central were marked "prepaid" when they were not in fact prepaid, which would have required an antecedent agreement. So the freight charges were marked for settlement through the general officers of the railroad, which was unusual. So, too, the fact that the Rutland rate on oil was a commodity rate and that the shipments of the Vacuum Company were the only shipments likely to take it was proper to be considered in determining whether there had been a previous arrangement with that road. There was other testimony in the record with respect to methods of shipment and manner of payment likewise tending to show an antecedent agreement between the defendant and the different carriers.

The testimony indicated, showing an antecedent agreement between the defendant and the carriers, tended also to show agreement or, at least, concert of action among the carriers themselves. There was also much other evidence to the same effect. The testimony with respect to the making and collecting of the charges goes far to show concerted action. The Pennsylvania road sent its shipments "blind billed." It neither named its own rate nor stated a through rate. It accepted

the shipments under an order to the agent of the New York Central to pay through to Norwood. The New York Central and the Rutland received the freight under the single through bill of lading and issued no bills of lading of their own. The New York Central gave a rate for the carriage from Rochester to Norwood which, as we have seen, applied only to through shipments. All the roads treated the shipments as through, and not as local, shipments and they rendered the entire transportation service without other direction or instruction than the original shipping order to the Pennsylvania road. The method of forwarding at junction points and the manner of settlement of accounts also indicated an understanding among the carriers. Without reviewing the evidence in detail, we are satisfied that there was sufficient to warrant the jury in finding that there was concert of action, if not express agreement, among the carriers with respect to the continuous carriage of this freight, and, consequently, that a common arrangement was established.

The third contention of the defendant is that the trial court erred in holding that the 26½-cent rate between Olean and Norwood was the lawful rate applicable to these shipments. As shown in the statement of facts, the tariff filed with the Interstate Commerce Commission by the Pennsylvania road and concurred in by the New York Central fixed the rate on petroleum and its products from Olean to Norwood at 26½ cents per hundred pounds. The tariff provided that the "route should be in accordance with agreed percentages and as designated within." The tariff, however, did not designate the route, and no percentage sheets were filed with the Commission. Under these circumstances, we think that the route to which the tariff applied was the natural and direct route from Olean to Norwood by way of Rochester, which the shipments in question took. That seems to have been the only real route between the two points. The route by way of Buffalo was roundabout, and required the hauling of the freight for a considerable distance in a direction opposite from Norwood. It was rather a possible way than a route, and it did not appear that any petroleum had ever been moved over it. We think that shippers in general had a right to rely upon the published rate as the lawful rate over the direct and natural route between the designated points, and that it was binding upon the railroads for such route.

It must be clearly borne in mind that the primary purpose of the act to regulate commerce in requiring the filing of tariffs with the Interstate Commerce Commission was to fairly apprise shippers of the rates to be paid and to secure uniformity in charges. It is to be presumed that carriers in filing tariffs will act in good faith to carry out those purposes. It cannot be assumed that they will file schedules to serve as devices to evade the law. We are unwilling to assume that the carriers in this case filed the 26½-cent rate from Olean to Norwood merely to afford a basis for discriminations to favored shippers. Still, if no oil ever moved by way of Buffalo, if the Buffalo route were really not a route at all, and if the published rate were intended to apply over it alone, leaving the direct and natural route without any filed rate, it is difficult to see any object in filing the rate consistent

with the obligations which the railroads owed the public. But if the object were to deceive, it is sufficient to say that, in our opinion, the carriers did not go far enough to accomplish it—that the rate which they filed in the manner in which they filed it made it applicable, even if not intended, to the real and direct route between the two points. That it might also have been applicable to the Buffalo route is immaterial.

The situation is not materially different if we assume that the references to agreed percentages required shippers to look up the unfiled percentage sheets. There was, in our opinion, nothing upon those sheets sufficiently clear and certain to fairly apprise an intending shipper that the tariff upon petroleum was inapplicable to the direct route, but did apply to a route over which petroleum was never hauled.

The defendant contends that the published tariff was not sufficiently definite and complete to constitute a lawful tariff. It urges that a shipper who desired to ascertain whether the tariff was applicable by way of Rochester could obtain no information upon the subject from the files of the Interstate Commerce Commission. In our opinion, however, as already stated, the fair presumption would be—and the shipper could rely upon it—that the filed route applied to the natural and direct route over the two roads which was via Rochester.

The defendant also urges that the question whether the 26½-cent rate applied to these shipments should have been submitted to the jury. But the construction of the documents was for the court, and we think that the court was right in ruling that the 26½-cent rate was the lawful rate applicable to these shipments; that it was the published and filed rate which the carriers having filed were bound by, and which, under the Elkins law, a person or corporation could be found guilty of accepting a concession from.

The fourth contention of the defendant is that the trial court erred in ruling that the rate paid to the Pennsylvania Railroad for the transportation from Olean to Rochester and the rate paid to the New York Central Railroad for the transportation from Rochester to Norwood were not the lawful rates so far as the defendant was concerned. As shown in the discussion of the last point the lawful rate, so far as the carriers were concerned, for these transportation services, was the published and filed rate. As it is admitted that the defendant had knowledge of this published rate, it was also the lawful rate so far as the defendant was concerned. We think this contention of the defendant without foundation.

The fifth contention of the defendant is that the evidence was insufficient to warrant the jury in finding that the defendant knowingly committed the offense charged. The defendant also contends that the trial court made erroneous rulings and gave erroneous instructions upon this feature of the case. Now, without reviewing it, it seems sufficient to say that, in our opinion, there was evidence in the case which, with all the circumstances and the inferences properly to be drawn therefrom, warranted the jury in finding: (1) That the defendant before these shipments were made had entered into an arrangement with the carriers with respect to the billing, the rates, the payment of the freight, and the continuous interstate carriage of the oil. (2) That

the defendant knew that the rates which it paid in accordance with its arrangement with the carriers amounted to less than the published and filed rate for the transportation service.

It follows, then, that if the defendant regarded the published rate as applicable to the route over which the oil, with its knowledge, was shipped, it knowingly accepted a concession from such rate. And if it did not so regard the published rate, if the filing of the rate and the entire course of dealing between the defendant and the carriers amounted merely to a device to circumvent the law, to mislead other shippers and to discriminate in favor of the defendant, still none the less, as we have shown, was the published rate the lawful rate applicable to the shipments and none the less was the concession therefrom a concession in violation of the statute.

In our opinion, the evidence was sufficient to warrant the jury in finding that the defendant knowingly accepted a concession, and we find no error in the rulings or instructions regarding the defendant's guilty knowledge.

With respect to the remaining contentions of the defendant, it is enough to say that we have carefully examined and considered them all, and we find no prejudicial error in the rulings or charge of the trial court complained of.

The judgment of the District Court is affirmed.

NOTE.—The following is the opinion of Hazel, District Judge, in the court below:

Hazel, District Judge. This is a motion by defendant for a new trial and in arrest of judgment upon claimed insufficiency of the indictment and exceptions to the ruling of the court and its refusal to instruct the jury as requested. The indictment contains 40 counts, and charges the acceptance by the defendant of concessions on interstate transportations of petroleum and its products from a published and filed tariff of rates, in violation of section 1, Act Feb. 19, 1903, c. 708, 32 Stat. 847 (U. S. Comp. St. Supp. 1909, p. 1138), commonly known as the "Elkins Act." Upon all the counts the jury returned a general verdict of guilty as charged in the indictment. Various reasons are assigned on behalf of the defendant why a new trial should be granted; the principal one being that the Circuit Court of Appeals for the Seventh Circuit, in Standard Oil Company of Indiana v. United States, 164 Fed. 376, 90 C. C. A. 364, has, since the trial of this case, definitely decided that the gist of an offense of this character is the payment or settlement of the carrying charges at a lower rate than that filed and published with the Interstate Commerce Commission. If failure to specifically allege payment in the indictment is a substantial omission, then the objection which was first raised in the present case on demurrer is well founded and necessarily leads to a discharge of the defendant. But, on consideration and examination of the authorities, I adhere to my original ruling on demurrer in so far that the indictment is not fatally defective for failing to specifically allege the unit of the offense or the specific payment or settlement at a concession rate, and that the carriers were bound to carry the merchandise at the lawful rate notwithstanding the conceded fact that the initial carrier had facilities for transporting it over different routes. The proofs are that the lower rate of transportation of the commodity specified in 40 separate counts was actually paid by the defendant in 10 monthly payments or settlements, and accordingly it is scarcely conceivable wherein its substantial rights have been prejudiced by the decision on demurrer unless it is true, as contended, that failure to allege payment at the lower rate was a fatal or prejudicial omission. In Standard Oil Company of Indiana v. United States, supra, upon an indictment charging the defendant

179 F.—40

"with accepting and receiving a concession," the learned court held, Judge Grosscup writing the opinion, that "the gist of the offense is the acceptance of the concession irrespective of whether the property involved was carloads, trainloads or pounds," and that it was necessary that the transaction should have been consummated by payment or settlement. This holding by an appellate tribunal is entitled to great respect, and, as there are no conflicting decisions, it should be followed by the Circuit and District Courts in other districts in cases where the facts are precisely the same. Hale v. Hilliker (C. C.) 109 Fed. 273. From a careful reading of the opinion, however, I am persuaded that payments at the concession rates, though not directly charged in the indictment, are included in the allegation that the defendant knowingly accepted and received from the carriers a concession in respect to the transportation of certain of its property in interstate commerce. This allegation, if it stood alone, probably would not charge the crime with sufficient directness, but, when it is considered and given effect with the other averments showing the lawful rate and shipment at a lower rate, the offense of accepting a concession is fairly charged. Dunbar v. United States, 156 U. S. 185, 15 Sup. Ct. 325, 39 L. Ed. 390; Smith v. United States, 157 Fed. 721, 85 C. C. A. 353; Evans v. United States, 153 U. S. 588, 14 Sup. Ct. 934, 38 L. Ed. 830. Moreover, it is well settled that a statutory offense may be described in the words of the statute leaving it for a defendant to show in what respect he may be prejudiced by reason of the failure to allege in the indictment an element of the offense. Such is the holding of the authorities binding upon this court (Ledbetter v. United States, 170 U. S. 606, 18 Sup. Ct. 774, 42 L. Ed. 1162; Armour Packing Co. v. United States, 209 U. S. 83, 28 Sup. Ct. 428, 52 L. Ed. 681), and, accordingly, I hold that the paragraph at the end of the indictment read in connection with the more specific allegations sufficiently charges the essential ingredients of the offense. Such allegations were sufficient in my opinion to acquaint the defendant with the particular matters upon which the prosecution would rely at the trial and also as to the character of the evidence which the defendant would be called upon to meet. In entire consonance with this rule is the recent decision of the Supreme Court in New York Central & Hudson River Railroad Company v. United States, 212 U. S. 481, 29 Sup. Ct. 304, 53 L. Ed. 613.

It is true that the trial proceeded against the defendant upon the theory that the interstate transportation of each car load lot of petroleum constituted separate and distinct offenses, and that payment was not the principal element, although, as stated, it was proven at the trial that the offenses were consummated by 10 monthly payments at a rate lower than the established rate. It is also true that the court in effect instructed the jury that it was in their power to convict the defendant of 40 separate and distinct offenses, or, at their option, to convict the defendant of such counts only as the proofs warranted, and also that it was in their power to find the defendant guilty as charged in the indictment. Giving effect to the subsequent decision of the Circuit Court of Appeals for the Seventh Circuit, it follows that in the present case the defendant could not be convicted of more than 10 offenses as evidenced by the payment of the concession rates which included different shipments over the same route at different times. In United States v. Central Vermont Railway (C. C.) 157 Fed. 291, the indictment alleged in many counts different agreements for the payment of rebates, and it appeared that the actual payment covering such agreements was made on the same day. The question arose whether there was one offense charged in the indictment or whether each agreement constituted separate and distinct violations of the statute. It was substantially held by Judge Hough that the indictment was not subject to criticism, but that in the event of conviction the defendant could not be penalized upon separate and distinct counts, charging the agreement to accept rebates, but only for the actual payment. Such was also the holding of Judge Knappen in United States v. Stearns Salt & Lumber Company (D. C.) 165 Fed. 735, and of Judge Trieber in United States v. Bunch (D. C.) 165 Fed. 736. Moreover, it is quite evident that the jury would have convicted the defendant of the offenses as evidenced by the payments of the concession rate, and therefore it is difficult to see how the defendant was prejudiced by the asserted theory upon which the case was submitted to the jury.

The next point is that the court should have submitted to the jury as a question of fact whether tariff sheet, I. C. C. No. 459 (Exhibit No. 41), containing the 26½-cent rate plus $28 per tank car for transportation from Olean, N. Y., to Rutland, Vt., applied to the route over which the commodity was transported. In this connection the court was requested by the defendant to instruct the jury as follows: "That the defendant is chargeable only with such knowledge as to whether tariff 459 was applicable to these shipments as could have been obtained upon reasonable, diligent inquiry."

And again: "That the undisputed evidence is that such reasonable and diligent inquiry of the officers and employés of the Pennsylvania Railroad and the New York Central Railroad who issued these tariffs and who had to do with the quoting of rates to shippers would have informed the shipper that the tariff was not applicable over the route which these shipments took, and the jury may take that into account in determining whether there was any intention on the part of the defendant to violate the law." Compliance with this request would have been inconsistent with the instructions of the court that as a matter of law the 26½-cent rate plus the $28 rate was the lawful rate, and that the routing over the lines of the carrying railroad companies via Rochester and Norwood to the point of destination was covered and in- cluded by such tariff. The court substantially instructed the jury that as a matter of law the published and filed rate was the lawful rate, and that it included all the routes available to the initial carrier for transporting the product to the point of destination.

It was proven, and the defendant admitted, that it had in its possession at the time of the transportation the tariff sheet, I. C. C. No. 459, which, un- der the instructions of the court, covered the transportation in controversy. No testimony was offered to show that the defendant in any endeavor to as- certain the lawful rate had difficulty in so doing on account of any ambiguity arising from the printing on the cover of the tariff sheet of the words "route in accordance with agreed percentages." The defendant did not make in- quiries of the carrying companies regarding the tariff of rates on the trans- portations specified in the indictment or whether tariff sheet I. C. C. No. 459 applied to the transportation in controversy. If inquiries had been made by the defendant, it no doubt would have been informed by the employers of the carriers that tariff sheet I. C. C. No. 459 did not apply to the Rochester- Norwood route in the absence of an agreement between the carriers as to per- centages. But, as no information on this subject was sought, the defendant was not in my opinion entitled to the instructions to the jury above quoted. That, in the estimation of the employés of the carriers, the Rochester-Norwood route was not included in the established tariff, can have no material bearing upon the defendant's intention to violate the statute if it had knowledge of the lawful rate. The case of Armour Packing Company v. United States, supra, instructively bears upon the intention to violate the statute. There the ship- ment was under special contract as to the carrying rate; the contract carrying charges being the same as the published and filed rate. The court held that the special contract as to the rate charges was subject to later changes, and that the defendant could not claim that he believed he was acting within his legal rights in insisting upon the goods being carried at the contract rate. The Supreme Court, speaking of the defendant's knowledge and guilty intent, says: "The stipulated facts show that the shippers had knowledge of the rates published, and shipped the goods under a contention of their legal right so to do. This was all the knowledge or guilty intent that the act re- quired. A mistake of law as to the right to ship under the contract after the change of rate is unavailing upon well-settled principles." So here the defendant was claimed to have knowledge of the established rate and the jury so found. If such rate included the route by which the property was carried as charged by the court, the defendant cannot be heard to say that it did not believe such rate applied, but believed it applied to another route. The defendant cannot assert its ignorance of the law in order to obtain relief from its provisions. Reynolds v. United States, 98 U. S. 145, 25 L. Ed. 244; Jacobson v. Mass., 197 U. S. 11, 25 Sup. Ct. 358, 49 L. Ed. 643.

It is next contended that the exclusion of the 19-cent tariff for transporta-

tion of petroleum between Olean and Rutland by way of Rotterdam Junction, thence by the Boston & Maine Railroad to the White Creek Junction, was prejudicial to the substantial rights of the accused. To show an absence of criminal intent, it is argued that no shipper would be expected to use the 26½-cent rate as far as Norwood plus $28 per tank car to Rutland when he could transport his goods to the point of destination over another route at an appreciably less sum, and the decision of the Circuit Court of Appeals for the Seventh Circuit is cited as an express authority that such 19-cent through rate concededly in force at the time of the transportation should have been submitted to the jury. I think, however, that the situation in the present case is conspicuously different. Save in a single instance, there is a substantial disparity between the 19-cent rate and the rate paid, a difference of about $7 to $22 per car and aggregating $478.73 on the entire transportation, while in the case cited the excluded rate of another carrier was practically the same as that paid by the shipper who offered to show that it had frequently transported property between the points of carriage over the route of such other carrier. These are important features which distinguish this case from the Standard Oil Case of Indiana, and in my estimation the exclusion by me of such testimony, assuming it to have been error, was not harmful to the accused.

It is finally contended that the defendant should have been permitted to show that it gained nothing by the asserted concession, inasmuch as such testimony bore on the improbability of the defendant's intentional violation of the law. It must be conceded that the evidence is open to inference that the arrangement for the transportation of the commodity and payment of the concession rate through the general office was made by the carriers with the defendant, and, further, that the method of billing the merchandise was prearranged between the carriers and the defendant. It must be assumed that the jury found as a fact that the rate was paid with knowledge that it was lower than the lawful rate. The defendant was presumed to have known as a matter of law that to accept a concession from the carrier was an act prohibited by statute. The case of Perkins v. Moss, 187 N. Y. 411, 80 N. E. 383, 11 L. R. A. (N. S.) 528, relied upon by the defendant in support of its contention that because it gained nothing by the concession there was no intention to violate the statute, was not a case where at the time of the commission of the act such act was a wrong prohibited by statute, for, if it had been, the Court of Appeals says: "An honest belief that it (the act committed) was right would not absolve the defendant from indictment."

The motion of the defendant for a new trial and in arrest of judgment must be denied.

